[936 NYS2d 86]

Verizon New York, Inc., et al., Respondents, v Optical Communications Group, Inc., Appellant.

First Department, December 1, 2011

**APPEARANCES OF COUNSEL**

*Klein Law Group, PLLC*, Albany (*Andrew M. Klein* and *Allen C. Zoracki* of counsel), and *Hofheimer Gartlir & Gross, LLP*, New York City (*Robert J. Kenney* and *Zachary B. Grendi* of counsel), for appellant.

*Kirkland & Ellis LLP*, New York City (*David S. Flugman* and *Joseph Serino, Jr.* of counsel), for respondents.

**OPINION OF THE COURT**

MAZZARELLI, J.P.

Plaintiff Verizon New York, Inc. (Verizon) owns a network of subterranean conduit systems that extends throughout New York City. Because its ownership of the network would enable Verizon to exercise monopoly control over the provision of telecommunications services, the Public Service Law places strict controls over Verizon's use of the conduit system. The Public Service Commission has promulgated rules requiring that common carriers, such as Verizon, permit other companies to use space in the conduits. The regulations also restrict the amounts common carriers can charge for leasing space to others.

Defendant Optical Communications Group, Inc. (OCG) is a telecommunications service provider that competes directly with Verizon. In or about July 1998, OCG and Verizon entered into a "Conduit Occupancy Agreement" (the agreement) giving OCG the right to lease space in Verizon's conduit network in which to run its own infrastructure. The agreement required OCG to pay Verizon, within 30 days of billing, monthly conduit occupancy rental fees that were to be determined by a schedule

filed with the Public Service Commission. The agreement also governed the manner by which OCG was to request conduit space and the contingency that the space was not readily available. Pursuant to these sections of the agreement, OCG would request that Verizon search its records to determine whether there was free space in a particular area. If not, Verizon would provide OCG with an estimate of the cost to OCG to have the necessary space made available. Verizon's corporate affiliate, plaintiff Empire City Subway Company (Limited) (ECS), was responsible for this so-called "make-ready" work.

OCG contends that, well after the agreement went into effect, Verizon misrepresented to it the availability of certain conduit space that it had sought to lease for various projects. OCG alleges that Verizon purposely concealed that the space was available so that it would have no choice but to engage and pay ECS to perform make-ready work. OCG further maintains that Verizon overcharged it for its lease of certain conduits, in violation of the agreement and the regulations, and, when OCG refused to pay the overcharged amounts, blocked its access to the network. This, OCG alleges, led to lost business, since, without this access, it could not provide telecommunications services to its own customers. For example, OCG asserts that Verizon frustrated its ability to complete a project known as the Long Island Fiber Deployment. The project was designed for a specific OCG customer, and required end-to-end connectivity from eastern Suffolk County to western Nassau County. OCG contends that Verizon overcharged it for the lease and for the make-ready work, and locked it out of the conduits for three years after it refused to pay the inflated charges, to its and its customer's detriment.

Based on OCG's refusal to pay amounts it believed were improperly assessed against it, Verizon and ECS commenced this action. They allege that OCG breached the agreement when it failed to make timely lease payments to Verizon and when it failed to pay for make-ready work performed by ECS. OCG interposed 10 counterclaims. The first counterclaim is for breach of the agreement and is based on the general allegations that Verizon failed to abide by its contractual obligation to make conduit space available to OCG and to charge the agreed-upon rates. The fourth, fifth and tenth counterclaims are the subjects of this appeal. The fourth and fifth counterclaims are, respectively, for fraud and fraudulent inducement. The former is based on Verizon's alleged practice of misrepresenting the availability

of conduit space. The latter is related to the Long Island Fiber Deployment described above. It alleges that OCG embarked on that project in reliance on Verizon's false representations that, as provided in the agreement, it would charge the agreed amounts.

The tenth counterclaim was interposed against both Verizon and ECS for violation of the Donnelly Act (General Business Law § 340 *et seq.*). In this counterclaim, OCG alleges that Verizon and ECS conspired to unlawfully interfere with the deployment and availability of communications conduit and fiber-optic cable facilities and services, by developing and implementing processes and actions to hinder the construction, reservation, accessibility and availability of conduit and fiber optics. OCG alleges that the geographic market for communications conduit has been, and remains, adversely affected by the actions and arrangements of Verizon and ECS.

Verizon and ECS moved pursuant to CPLR 3211 (a) (7) to dismiss the fourth, fifth and tenth counterclaims.* While acknowledging that OCG had stated a cause of action for breach of contract, they argued that the fraud and fraudulent inducement counterclaims against Verizon were duplicative of the counterclaim for breach of contract, and thus improper. As for the Donnelly Act claim, they contended that ECS was a direct and wholly owned subsidiary of Verizon, and that thus they were considered a single actor that was unable to restrain trade with itself. In reply to OCG's opposition papers, Verizon and ECS submitted an affidavit by a person who is both assistant secretary of Verizon and secretary of ECS, who attested to their corporate status.

The motion court granted the motion in its entirety. It found that the fourth and fifth counterclaims were duplicative of the breach of contract claim. It further found that, because of their corporate relationship, Verizon and ECS could not have engaged in anticompetitive behavior. We affirm.

A fraud claim may coexist with a breach of contract cause of action only where the alleged fraud constitutes the breach of a

---

* The counterclaims at issue had been amended in an amended answer. Verizon and ECS moved to dismiss the original counterclaims but that motion was denied as moot after OCG was granted leave to amend. OCG argues in its principal brief that the instant motion should have been denied because the denial of the original motion did not expressly state that it was without prejudice to renewal upon receipt of the amended pleading. The argument fails since the denial was clearly not on the merits.

duty separate and apart from the duty to abide by the terms of the contract (*see North Shore Bottling Co. v Schmidt & Sons,* 22 NY2d 171, 179 [1968]). OCG argues that Verizon owed it an independent duty, imposed by the Public Service Commission, not to discriminate in providing access to its conduit network, and not to charge rates above those permitted by the regulations. In making this argument, OCG relies heavily on the Court of Appeals' decision in *Sommer v Federal Signal Corp.* (79 NY2d 540 [1992]).

In *Sommer,* the owner of a commercial building (the plaintiff) contracted with a fire alarm company (the defendant) for the latter to relay fire alarms sounded in the building to the New York City Fire Department. Due to a misunderstanding between a building engineer and a dispatcher employed by the defendant, the system, which had been deactivated one day at the building owner's request, remained deactivated despite the engineer's request that it be reactivated. A fire occurred that evening, and the defendant failed to relay to the fire department the alarms that it was aware were going off in the building. The plaintiff commenced an action against the defendant for damages arising from the breach of their contract as well as from negligence. The Court of Appeals analyzed whether the plaintiff could have a claim for both breach of contract and negligence arising out of the same nucleus of fact. In doing so, the Court acknowledged the existence of a "borderland" between tort and contract claims, and the difficulty in certain scenarios of separating one from the other (79 NY2d at 550). The Court reviewed prior cases in which it had distinguished the two types of claims and identified certain "guideposts" for the endeavor (*id.* at 551). In restating those guideposts, the Court first noted that merely alleging that a party breached a contract because it failed to act with due care will not transform a strict breach of contract claim into a negligence claim (*id.*). However, the Court continued:

> "A legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship. Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care" (*id.* at 551-552 [citations omitted]).

Further, the Court observed that "the nature of the injury, the manner in which the injury occurred and the resulting harm" are all relevant factors in considering whether claims for breach of contract and tort may exist side by side (*id.* at 552).

Based on these factors, the Court in *Sommer* allowed both claims to go forward. The defendant's duty to act with reasonable care, the Court held, was not only governed by its contract with the building, but also by New York City's comprehensive scheme of fire safety regulations, which required the building to have a central station fire service. In addition, the Court noted that the defendant was franchised and regulated by the City. Thus, the Court concluded that the defendant's duties were "affected with a significant public interest; failure to perform the service carefully and competently can have catastrophic consequences. The nature of [the defendant's] services and its relationship with its customer therefore gives rise to a duty of reasonable care that is independent of [the defendant's] contractual obligations" (*id.* at 553).

In interpreting *Sommer*, this Court has described the nature of the harm, particularly whether it is "catastrophic," as "one of the most significant elements in determining whether the nature of the type of services rendered gives rise to a duty of reasonable care independent of the contract itself" (*Trustees of Columbia Univ. in City of N.Y. v Gwathmey Siegel & Assoc. Architects*, 192 AD2d 151, 154 [1993] [negligence claim stated, in addition to breach of construction contract, where shoddy construction work caused a large chunk of concrete to fall into courtyard regularly used by college students]; *see also Duane Reade v SL Green Operating Partnership, LP*, 30 AD3d 189 [2006] [negligence claim stated where landlord's reduction of heat in commercial building caused burst pipe and $500,000 worth of flood damage]).

Indeed, the Court of Appeals has declined to extend *Sommer* to cases involving only economic harm. In *New York Univ. v Continental Ins. Co.* (87 NY2d 308 [1995]), the issue was whether plaintiff, in seeking coverage under an insurance contract, could receive punitive damages. Distinguishing *Sommer*, the Court held that such damages were only available if the conduct in question rose to the level of a tort independent of the contract itself. It found that the defendant's denial of the plaintiff's claim did not qualify as a tort, even in light of the regulatory scheme established by the Insurance Law:

"To be sure, the provisions of the Insurance Law

reflect State policy that insurers must deal fairly with their insureds and the public at large. But governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens. As compared to the fire-safety regulations cited in *Sommer,* the provisions of the Insurance Law are properly viewed as measures regulating the insurer's performance of its contractual obligations, as an adjunct to the contract, not as a legislative imposition of a separate duty of reasonable care (*see,* Insurance Law § 2601 [c]; § 109 [b])" (87 NY2d at 317).

Notably, the Court confirmed that, in *Sommer,* it meant to emphasize the nature of the harm in identifying when an independent duty exists, and "not [to] suggest that statutory provisions necessarily or generally impose tort duties independent of contractual obligations" (*id.*).

■ The harm alleged here does not rise to the level required to transform it from contractual to tortious in nature. We recognize that Verizon's conduct, as alleged, violated the Public Service Law. We also acknowledge that the alleged harm had an effect on the public, albeit an indirect one, since the public relies on the ability of carriers like OCG to access Verizon's network to promote competition in the field. Nevertheless, *Sommer* and *New York Univ.* make clear that the public's interest in compliance with a statutory and regulatory scheme is not sufficient to create tort liability. Rather, tort liability arises out of "catastrophic consequences that . . . flow from [a party]'s failure to perform its contractual obligations with due care" (*New York Univ.,* 87 NY2d at 317). It does not result from an injury that, like the harm here, is "solely financial" and "not typical of [harm] arising from tort" (*Logan v Empire Blue Cross & Blue Shield,* 275 AD2d 187, 193 [2000], *lv dismissed* 96 NY2d 823 [2001]). To echo the Court of Appeals, the regulation of telecommunications carriers is "not in the same league as the protection of the personal safety of citizens" (87 NY2d at 317). Accordingly, the motion court correctly dismissed the counterclaims for fraud and fraudulent inducement.

Regarding its tenth counterclaim, alleging violation of the Donnelly Act, OCG argues that Verizon and ECS should not be considered a single actor because they have not adequately established their corporate relationship for purposes of the motion. OCG does not point to any particular infirmity in the affi-

davit by the secretary for both entities that describes the relationship. Rather, it complains that the affidavit was first submitted in reply. OCG further argues that, in any event, a per se single-actor antitrust immunity rule should not apply to the Donnelly Act as it does to the federal Sherman Antitrust Act. Finally, OCG argues that Verizon and ECS do not deserve immunity because, unlike Verizon, ECS is not regulated as a common carrier, and so the two corporations do not have a "unity of interest."

■ We find that Verizon and ECS sufficiently established their status as parent and subsidiary. The reply affidavit by the Verizon and ECS secretary was properly accepted in light of OCG's own recognition in its counterclaims that the two companies are affiliated. Moreover, OCG has not offered any reason why the affidavit is not dispositive of the issue. Further, we reject OCG's argument that Verizon and ECS are not immune from claims that they have violated the Donnelly Act. This argument is based on OCG's theory that, because of differences in the structure of the Sherman Act and the Donnelly Act, it is wrong to view them as analogous. Thus, OCG contends, there is no reason to follow the federal courts, which apply an intra-enterprise immunity rule to the Sherman Act. However, OCG offers no controlling authority to support its theory that the Donnelly Act does not contain this immunity. To the contrary, ample precedent confirms that the immunity does exist (see e.g. North Atl. Utils. v Keyspan Corp., 307 AD2d 342, 343 [2003], lv denied 1 NY3d 503 [2003]; Barnem Circular Distribs. v Distribution Sys. of Am., 281 AD2d 576, 577 [2001]). Presumably, those courts that have considered the issue were aware of the differences between the two acts. Finally, OCG fails to offer any support for its argument that, because Verizon is regulated but ECS is not, they do not enjoy the unity of interest that shields them from antitrust liability.

Accordingly, the order of the Supreme Court, New York County (Barbara R. Kapnick, J.), entered June 1, 2009, which granted plaintiffs' motion to dismiss defendant's fourth, fifth, and tenth counterclaims should be affirmed, with costs.

SAXE, FRIEDMAN, ACOSTA and FREEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered June 1, 2009, affirmed, with costs.