OPINION OF THE COURT
Marcy Friedman, J.
Defendants The Bank of New York Mellon and The Bank of New York Mellon Corp., on behalf of themselves and dissolved entity BNY Alternative Investment Services, Inc., move to dismiss this action, pursuant to CPLR 3211 (a) (1) and (7), based on documentary evidence and for failure to state a cause of action. Defendants also move to dismiss on the ground that plaintiffs lack standing.
Plaintiffs are three law firms that represented two subclasses in consolidated federal class actions (In re Tremont Sec. Law, State Law & Ins. Litig. (US Dist Ct, SD NY, 08 Civ 11117 [TPG]) (Tremont action), alleging claims arising out of the Madoff ponzi scheme.
The nominal plaintiffs in the instant action, Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LI] and Rye Select Broad Market XL Fund LP (Rye Funds), were, at all relevant times, Delaware limited partnerships managed by their general partner, Tremont Partners, Inc. (First amended complaint [amended complaint] ¶ 24.) The Rye Funds invested substantially all of their clients’ funds with Bernard L. Madoff Investment Securities LLC (BMIS). The investors that comprised the subclasses were limited partners in the Rye Funds. As of December 2008, when Madoff was arrested, the Rye Funds held accounts with BMIS valued at approximately $3 billion. (Amended complaint ¶ 55.)
Defendant The Bank of New York Mellon Corporation (BNYM Corp.) is a Delaware corporation and the parent of defendant The Bank of New York Mellon (BNYM). Defendant BNY Alternative Investment Services, Inc. (BNY-AIS) is a division of BNYM. The three Bank of New York Mellon entities (collectively BNY Mellon or Bank) “acted as the fund Administrator, Sub-Administrator, and/or Custodian for the Rye Funds.” (Amended complaint ¶ 29.)
*890 Pursuant to a stipulation and order in the Tremont action, dated December 9, 2009, the Rye Funds’ claims against BNYM Corp. and BNY-AIS were voluntarily dismissed without prejudice. (Aff of Nazneen Mehta [defendants’ attorney] [Mehta aff], exhibit A.) By judgment and order filed on August 19, 2011, the District Court approved a settlement of the Tremont action. The court made findings, “for the purposes of the Settlement only,” that the state law subclass and the securities subclass met the prerequisites for maintenance of a class action. (Mehta aff, exhibit B, ¶¶ 4, 5.) By stipulation of partial settlement, dated February 23, 2011, the Rye Funds agreed to assign their claims against “Bank of New York Mellon” to plaintiffs’ state law and securities settlement class counsel “for the benefit of the State Law Subclass and Securities Subclass.” The stipulation further provided that such claims “may be prosecuted at the direction of Plaintiffs’ State Law and Securities Settlement Class Counsel if prosecution of such claims is deemed to be in the best interest of the State Law Subclass and Securities Subclass.” (Mehta aff, exhibit C, § 2.17.) This assignment was confirmed by a May 29, 2012 letter from counsel for the Rye Funds. (Aff of Arthur Nealon [plaintiffs’ cocounsel], exhibit B.)
The amended complaint pleads three causes of action. The first is for gross negligence. (Amended complaint ¶¶ 95-103.) The second is for “breach of fiduciary duty with gross negligence.” (Amended complaint ¶¶ 104-111.) The third, for professional malpractice, has been withdrawn. (Plaintiffs’ mem in opp at 14 n 11.)
In the first cause of action, the amended complaint alleges that “[b]y virtue of its superior knowledge, BNY MELLON owed a common law duty of care to the Rye Funds to disclose material adverse facts affecting assets under BNY MELLON’s administration.” (Amended complaint ¶ 100.)[1] It further alleges that BNY Mellon acted with gross negligence, and breached its common-law duty of care, in the following respects: First, the Bank allegedly failed to disclose that Madoff reported bogus trades on the Rye Funds’ behalf of BNY Mellon’s own shares, and calculated the Rye Funds net asset value (NAV) as if the trades in such shares were “real.” (Id. ¶ 101.) The amended complaint alleges that the Bank had business records reflecting *891 the purchase and sale of its own shares and therefore had “superior knowledge of the true facts.” (Id. ¶¶ 69-71.) Second, the Bank failed to disclose suspicious activities in the BMIS account that was also maintained at the Bank. (Id. ¶ 102.) The amended complaint alleges that the Bank was required by the Bank Secrecy Act (31 USC §§ 5311-5332) to conduct due diligence on accounts maintained with it and to report money laundering transactions to the government. The amended complaint further asserts that BNY Mellon therefore had superior knowledge about the BMIS account, and acted with gross negligence in not disclosing to the Rye Funds “the conflict of interest arising from Madoff s suspicious banking activities” involving the BMIS account. {Id. ¶¶ 59-65.) Third, the Bank ignored “red flags” that should have alerted it to the fact that the Funds’ assets were at risk for fraud. {Id. ¶ 97.) The amended complaint catalogs red flags that included suspiciously consistent returns and patterns of purchases, suspect trading volumes, Madoff s role as both broker and custodian for all of the assets he managed, public reports questioning his operations, Madoff s use of paper trade confirmations, and the Rye Funds’ lack of electronic access to their accounts at BMIS. (Id. ¶¶ 9, 66-68.) Fourth, the Bank’s predecessor acquired a subsidiary, Ivy Asset Management LLC (Ivy), which purportedly limited its investments with Madoff due to concerns about his operations. The amended complaint alleges that the predecessor “undoubtedly conducted substantial due diligence on Ivy” before acquiring it, and the Bank therefore knew or should have known that Mad-off was misusing client funds. (Id. ¶¶ 72-82.) Fifth, as cash custodian for the Rye Funds, the Bank had common-law and fiduciary duties to “monitor and protect any and all cash and cash equivalents of the Rye Funds,” and should have discovered and disclosed the inadequacy of Madoff s sub-custodial records of cash and cash flows. (Id. ¶¶ 56-58.)
The second cause of action for breach of fiduciary duty is based on substantially the same allegations as the gross negligence cause of action. The amended complaint thus pleads that BNY Mellon breached its fiduciary duties to “fully and fairly disclose all material facts actually known to it and/or reasonably available to it about Madoff s operations,” including:
“(1) inadequate sub-custodial records of cash and cash flows; (2) inexplicable cash flows to and through the BMIS account at BNY MELLON . . . ; (3) the known red flags indicating that the Rye *892 Funds’ assets were at a risk for fraud; (4) the purported purchases of BNY MELLON’s own stock that it knew never occurred; and (5) concerns about Madoff s operations raised by BNY MELLON’s own subsidiary Ivy.” (Id. ¶ 108.)
This cause of action is also based on the Bank’s conflict of interest in not disclosing Madoff’s suspicious banking activities in connection with the BMIS account that Madoff maintained at the Bank. (See id. ¶¶ 61, 107.)
Standing
As a threshold matter, the court rejects defendants’ contention, on the record as briefed, that plaintiffs lack standing because an unincorporated association may not maintain an action in its own name, and plaintiffs sue not in their own names but as a fictional entity. (Defendants’ mem in support at 24.) The amended complaint pleads that “[t]he Nominal Plaintiff Rye Funds have assigned their claims against BNY MELLON to Settlement Counsel for the benefit of the State Law Subclass and the Securities Subclass, and not in their individual capacities.” (Amended complaint ¶ 25.) As noted above (supra at 890), plaintiffs also annex documentary evidence of the assignment. Defendants fail to cite legal authority that addresses whether plaintiffs qualify as an unincorporated association within the meaning of General Associations Law § 12. The court need not finally determine this issue, in view of its holding, for the reasons stated below, that the amended complaint fails to state a cause of action.[2]
Failure to State a Cause of Action
It is well settled that on a motion to dismiss pursuant to CPLR 3211 (a) (7), “the pleading is to be afforded a liberal construction (see, CPLR 3026). [The court must] accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine *893 only whether the facts as alleged fit within any cognizable legal theory.” (Leon v Martinez, 84 NY2d 83, 87-88 [1994]; see 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144 [2002].) However, “the court is not required to accept factual allegations that are plainly contradicted by the documentary evidence or legal conclusions that are unsupportable based upon the undisputed facts.” (Robinson v Robinson, 303 AD2d 234, 235 [1st Dept 2003]; see also Water St. Leasehold LLC v Deloitte & Touche LLP, 19 AD3d 183 [1st Dept 2005], lv denied 6 NY3d 706 [2006].) When documentary evidence under CPLR 3211 (a) (1) is considered, “a dismissal is warranted only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law.” (Leon v Martinez, 84 NY2d at 88.)
The Rye Funds entered into two substantially similar administrative services agreements—a July 1, 2007 agreement between Rye Select Broad Market Fund LP and Rye Select Broad Market Prime Fund LP and BNY-AIS (Mehta aff, exhibit D); and a September 1, 2006 agreement between Rye Select Broad Market XL Fund LP and BNY-AIS. (Mehta aff, exhibit E.) The agreements provided for BNY-AIS to furnish the administrative services listed on schedule I, which include: establishing and maintaining accounts in the name of the Rye Funds; receiving and disbursing subscription payments in connection with the sale of the Funds’ shares; receiving and paying fees and expenses on behalf of the Funds; acting as registrar and transfer agent with respect to the Funds’ shares and, in that capacity, processing subscription applications and maintaining subscriber registers and ledgers; preparing and maintaining customary financial and accounting books and records; acting as liaison with the Rye Funds’ independent public accountants; computing the net asset value of the Funds’ shares; and providing specified anti-money laundering services involving subscribers.
The administrative services agreements expressly provided that
“BNY-AIS shall have no duties or responsibilities whatsoever including any custodial duties, except such duties and responsibilities as are specifically set forth in this Agreement, including Schedule I, or as are otherwise required of BNY-AIS by laws or regulations applicable to BNY-AIS, and no covenant or obligation shall be implied against BNY-AIS in *894 connection with this Agreement.” (Mehta aff, exhibits D, E, ¶ 5 [m].)
The Rye Funds also entered into a global custody agreement with The Bank of New York. Although the agreement appointed the Bank as custodian of cash and securities (Mehta aff, exhibit F, art II, § 1), it is undisputed that the Bank served as custodian only for cash, and that Madoff himself acted as custodian for the securities he purportedly purchased for the Rye Funds’ accounts. (Amended complaint ¶ 56.)
As the amended complaint alleges, “BNY MELLON was responsible for performing certain day-to-day administration tasks on behalf of the Rye Funds.” (Amended complaint ¶ 87.) BNY Mellon served as the Funds’ administrator, sub-administrator, and cash custodian. (Id. ¶¶ 29, 44, 56.) The Funds had a separate investment advisor, Tremont Partners, Inc., and independent auditors.
The administrative services agreements did not provide, and the amended complaint does not allege, that BNY Mellon had any responsibility for recommending or selecting the Funds’ investments, or trading the securities. Moreover, the administrative services agreements expressly authorized BNY Mellon to rely on information furnished by the Funds in performing its administrative services, including the calculation of net asset value. They thus stated that
“[i]n the event BNY-AIS’s computations hereunder rely, in whole or in part, upon . . . prices or values supplied by the Fund or by brokers, dealers, market makers, or specialists described in the Offering Materials, BNY-AIS shall not be responsible for, under any duty to inquire into, or deemed to make any assurances with respect to, the accuracy or completeness of such information.” (Mehta aff, exhibits D, E, ¶ 5 [g].)
Plaintiffs do not allege any breach by BNY Mellon of its contractual duties under the administrative services agreements. Nor do plaintiffs dispute that the administrative services agreements permitted plaintiffs to calculate NAVs by relying, without verification, on information provided by third parties such as the Funds. Rather, they claim that BNY Mellon owed the Rye Funds a non-contractual common-law duty of due care as well as fiduciary duties. (Plaintiffs’ mem in opp at 2, 15.)
Gross Negligence
' First, plaintiffs argue that defendants acted with gross negligence in performing their administrative and cash custody *895 services. The administrative services agreements contain a provision exculpating BNY Mellon from liability for ordinary negligence. They provide that BNY-AIS shall not be liable for damages or claims resulting from, arising out of, or in connection with its performance under the agreements, except damages or claims for its “own bad faith, gross negligence or willful misconduct.” (Mehta aff, exhibit D, ¶ 7 [a]; exhibit E, ¶ 8 [a].) Under New York law, contractual provisions absolving a party from its own negligence are generally enforceable; but public policy prohibits enforcement of such clauses with respect to damages occasioned by gross negligence. (Colnaghi, U.S.A. v Jewelers Protection Servs., 81 NY2d 821, 823 [1993].) In the context of such exculpatory provisions, gross negligence “differs in kind, not only degree, from claims of ordinary negligence. It is conduct that evinces a reckless disregard for the rights of others or ‘smacks’ of intentional wrongdoing.” (Id. at 823-824 [citation omitted].)
The amended complaint fails to plead gross negligence. It does not allege that defendants breached, let alone recklessly disregarded, any contractual duty. For the reasons that follow, the law also does not impose any additional tort duty, or duty independent of contract, to exercise reasonable care. In arguing for such a duty, plaintiffs rely on Sommer v Federal Signal Corp. (79 NY2d 540 [1992]), which involved an owner’s claim against a fire alarm company for property damages sustained as a result of the company’s failure to report a fire to the fire department. The Court of Appeals held that the company had a duty to act with reasonable care that arose from the nature of its services—the protection of public safety—and that the plaintiffs claims were not limited to breach of contract but also sounded in tort. (Id. at 552.) In reaching this result, the Court reasoned that
“[a] tort may arise from the breach of a legal duty independent of the contract, but merely alleging that the breach of a contract duty arose from a lack of due care will not transform a simple breach of contract into a tort.
“A legal duty independent of contractual obligations may be imposed by law as an incident to the parties’ relationship.” (Id. at 551 [citations omitted].)
The Court also held that an exculpatory clause is enforceable as to claims arising from ordinary negligence, but not gross negligence. (Id. at 553.)
*896 The courts have expressly declined to extend the Sommer rule to cases involving solely economic harm. (See New York Univ. v Continental Ins. Co., 87 NY2d 308, 317 [1995] [holding that violation of Insurance Law provision prohibiting insurers from engaging in unfair settlement practices with insureds did not give rise to an independent tort, the Court reasoning that laws governing the conduct of insurers are not “in the same league as the protection of the personal safety of citizens” at issue in Sommer]; Verizon N.Y., Inc. v Optical Communications Group, Inc., 91 AD3d 176, 182 [1st Dept 2011] [holding that violation of Public Service Law, involving access of carriers to Verizon’s network, did not give rise to an independent tort, as it resulted in “solely financial” injury that was “not typical of (harm) arising from tort”].)
As this action, similarly, involves only economic harm, the law does not impose a tort duty of due care independent of the parties’ contracts. The complaint accordingly fails to state a cause of action for gross negligence.[3] ****8
Breach of Fiduciary Duty
Plaintiffs also fail to state a cause of action for breach of fiduciary duty. In order to plead breach of fiduciary duty, plaintiffs “must allege that (1) defendant owed them a fiduciary duty, (2) defendant committed misconduct, and (3) they suffered damages caused by that misconduct.” (Burry v Madison Park Owner LLC, 84 AD3d 699, 699-700 [1st Dept 2011]; Rut v Young Adult Inst., Inc., 74 AD3d 776, 777 [2d Dept 2010].) It is well settled that “[a] fiduciary relationship ‘exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.’ ” (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005], quoting Restatement [Second] of Torts § 874, Comment a]; Northeast Gen. Corp. v Wellington Adv., 82 NY2d 158, 172-173 [1993].) “The essential elements of a fiduciary relation are the concepts of reliance, and de facto control and dominance.” (Id. at 173 [internal quotation marks and citations omitted].) As the Court of Appeals has further explained:
*897 “Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm’s length business transactions. Generally, where parties have entered into a contract, courts look to that agreement to discover the nexus of the parties’ relationship and the particular contractual expression establishing the parties’ interdependency. If the parties do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them. However, it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.” (.EBC I, 5 NY3d at 19-20 [internal quotation marks, citations, ellipses, and brackets omitted].)
The issue of the existence of a fiduciary relationship between contracting parties is fact based and therefore not generally subject to dismissal on the pleadings. (See Ritani, LLC v Aghjayan, 880 F Supp 2d 425, 455 [SD NY 2012]; Anwar v Fairfield Greenwich Ltd., 728 F Supp 2d at 415.) Here, however, the pleaded allegations and administrative services agreements conclusively demonstrate that BNY Mellon did not owe the Rye Funds the fiduciary duties alleged in the amended complaint.
Assuming that BNY Mellon had a fiduciary duty within the scope of its undertaking—namely, the performance of services for the Rye Funds listed in schedule I of the agreements— plaintiffs do not allege that the Bank breached that duty in any respect. Rather, they allege that BNY Mellon had separate fiduciary duties arising out of the parties’ relation and imposed by law. These alleged fiduciary duties were to verify the investments, including Madoff s alleged investments in BNY Mellon’s own stock; investigate “red flags” of Madoff s fraud; ascertain from Ivy, a subsidiary, its knowledge of risks in investing with Madoff; monitor the bank account of BMIS at BNY Mellon; and generally safeguard the Rye Funds’ assets. (See e.g. amended complaint ¶ 108.)
The asserted fiduciary duties are inconsistent with the expressly assumed duties under schedule I, and with the parties’ specific disclaimer in the administrative services agreements that BNY Mellon shall have no duties or responsibilities except those expressly set forth in the agreements or imposed *898 by law. (Mehta aff, exhibits D, E, ¶ 5 [m] [quoted, supra at 893-894].) Plaintiffs do not claim that any statute or regulation imposes such duties on BNY Mellon.[4] Significantly, moreover, they do not plead any allegations about the relation of the parties that would support imposition of such duties by operation of law, particularly under these circumstances in which BNY Mellon’s duties were expressly limited by the administrative services agreements. (See EBC I, 5 NY3d at 19-20.)
Nor may plaintiffs predicate their claim that BNY Mellon had a duty to safeguard the Funds’ assets on BNY Mellon’s role as cash custodian. Plaintiffs do not allege that BNY Mellon breached any duty to safeguard the cash account, which was the only account maintained at the Bank by the Rye Funds. Nor do they allege that Madoff misappropriated any cash from the account. Plaintiffs’ claim is, rather, that Madoff made bogus trades of securities, which were held not by BNY Mellon but by Mad-off.
The pleading of the fiduciary duty claim based on a conflict of interest also fails. Plaintiffs assert that the Bank “engaged in a conflict of interest by servicing and monitoring the BMIS master bank account while simultaneously acting as administrator and custodian to the Rye Funds.” (Plaintiffs’ mem in opp at 2.) The complaint is devoid of any factual allegations that support a conflict of interest claim based on maintenance of custody accounts by separate investment funds at the same bank.
In sum, the amended complaint does not allege that BNY Mellon had any role in the Rye Funds’ investment decisions, any duty to independently value the Funds’ assets or to independently calculate the Funds’ NAY and any responsibility for monitoring sub-custodians. In addition, the administrative services agreements by their terms required BNY Mellon to provide *899 nondiscretionary administrative services. Under these circumstances, courts have repeatedly held that an administrator of an investment fund does not owe it a fiduciary duty. (See e.g. The Jordan [Bermuda] Inv. Co. v Hunter Green Invs. LLC, 2007 WL 2948115, *4, *24, 2007 US Dist LEXIS 75376, *9-11, *64 [SD NY, Oct. 3, 2007, No. 00 Civ. 9214 (RWS)] [holding, under New York law, that administrator had no fiduciary duty to investment fund, where administrator was not involved in making investment decisions for the fund, and was responsible for calculating the NAV for each share class, using information from fund’s investment manager]; Fraternity Fund Ltd. v Beacon Hill Asset Mgt., LLC, 376 F Supp 2d 443, 447-448 [SD NY 2005] [distinguishing between valuation of securities in a fund’s portfolio and calculation of the fund’s NAY and dismissing claim against administrator under section 10 (b) of the Securities and Exchange Act of 1934, where administrative agreement provided for administrator to compute NAY and plaintiffs failed to allege facts to show that administrator “had an obligation to independently calculate or verify” the prices provided by the fund]; compare e.g. In re Refco Inc. Sec. Litig., 826 F Supp 2d 478, 504-506 and n 17 [SD NY 2011], affd on other grounds 486 Fed Appx 153 [2d Cir 2012] [distinguishing Jordan and other cases holding that “no fiduciary duty exists where the defendants merely calculate NAVs and provide nondiscretionary administrative services” and holding, under New York law, that fiduciary duty claim was stated against fund administrator, where service agreement provided for administrator’s exercise of discretionary functions, including “computing, adjusting, verifying, updating and reconciling data obtained from the (fund’s) Investment Manager”; investigating any price or valuation irregularity; and investment of fund’s excess cash]; Pension Comm. of Univ. of Montreal Pension Plan v Banc of Am. Sec., LLC, 592 F Supp 2d 608, 617, 640-641 [SD NY 2009] [distinguishing Jordan on same grounds, and holding, under New York law, that triable issue of fact existed on breach of fiduciary duty claim against fund administrator, where duties of administrator under administrative services agreement included “independent! ) pricing (of) the fund by reference to . . . independent pricing sources”].)
Anwar v Fairfield Greenwich Ltd. (728 F Supp 2d 372 [2010], supra), on which plaintiffs rely, is consistent with these cases. In Anwar, the court denied the motion of various Citco defendants, the administrators and custodians of funds that had *900 invested with Madoff, to dismiss claims, among others, for gross negligence and breach of fiduciary duty under New York law. Under the administrative agreements at issue, Citco’s duties included “holding any securities purchased for the Fund, or ensuring that the securities were in the custody of the sub-custodian; maintaining an ongoing, appropriate level of supervision of any sub-custodians, including BMIS; . . . [and] independently calculating the NAY” (Id. at 441 [internal quotation marks omitted].) Citco was also required to “reconcile information provided by the Fund’s prime broker and custodian—Mad-off—with information provided by the Investment Manager.” (Id. at 393 [internal quotation marks omitted].) Further, in performing its services, Citco was “permitted only to rely on information it received without making further inquiries if that information demonstrated an ‘absence of manifest error.’ ” (Id.) Unlike BNY Mellon, Citco was responsible not merely for back-office administrative services, but for discretionary functions, involving supervision of sub-custodians and independent valuations.
The court accordingly holds that the amended complaint fails to plead a viable cause of action for breach of fiduciary duty against BNY Mellon.
Special Facts Doctrine
Finally, plaintiffs argue that BNY Mellon had “superior knowledge” about the nature and value of the Rye Funds’ assets and Madoff s suspicious activities, and therefore had a duty to disclose this information to the Rye Funds. (Plaintiffs’ mem in opp at 17-22.) Under the “special facts” doctrine, a party may have a duty to disclose information peculiarly within its knowledge, even in the absence of a fiduciary duty, “where one party’s superior knowledge of essential facts renders a transaction without disclosure inherently unfair.” (Swersky v Dreyer & Traub, 219 AD2d 321, 327 [1st Dept 1996] [internal quotation marks and citations omitted], appeal withdrawn 89 NY2d 983 [1997]; Jana L. v West 129th St. Realty Corp., 22 AD3d 274, 277 [1st Dept 2005]; see also P.T. Bank Cent. Asia, N.Y. Branch v ABN AMRO Bank N.V., 301 AD2d 373, 378 [1st Dept 2003].) “[T]he doctrine requires satisfaction of a two-prong test: that the material fact was information ‘peculiarly within [the] knowledge’ of [defendant], and that the information was not such that could have been discovered by [plaintiff] through the ‘ “exercise of ordinary intelligence.” ’ ” (Jana L., 22 AD3d at 278.) There is also authority that “where one party possesses *901 superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge, there is a duty to disclose that information.” (Stevenson Equip, v Chemig Constr. Corp., 170 AD2d 769, 771 [3d Dept 1991] [internal quotation marks and citation omitted], affd 79 NY2d 989 [1992].)
In asserting the applicability of this doctrine (although not referring to it by name), plaintiffs contend that BNY Mellon had superior knowledge about Madoff from three principal sources: First, they claim that BNY Mellon’s predecessor, The Bank of New York, “undoubtedly conducted substantial due diligence” in acquiring Ivy, a subsidiary that had evidence that Madoff was a fraud risk, and that BNY Mellon therefore “knew or should have known about the evidence that Madoff was misusing client funds.” (See amended complaint ¶¶ 72-82.) Second, plaintiffs claim that BNY Mellon was obligated to maintain business records reflecting purchases of its own stock and, based on these records, “would have actual and/or constructive knowledge that Madoff had not actually purchased the numbers of shares” he claimed. (Id. ¶ 69.) In response to BNY Mellon’s point that the shares were held in street name, plaintiffs argue that the Bank acted recklessly in not checking its own data. (Plaintiffs’ mem in opp at 20-21.) Third, plaintiffs argue that because Madoff maintained a BMIS account at BNY Mellon, the Bank had obligations under the Bank Secrecy Act to identify and report suspicious money laundering activities to the government. (Amended complaint ¶¶ 59-64.) Plaintiffs assert that the Bank therefore “either was or should have been suspicious of Madoff’s money laundering operations through the BMIS account,” and “recklessly overlooked or ignored evidence that something was wrong with the cash flows to and through the BMIS account.” (Id. ¶ 65.)
These allegations fail as a matter of law to support plaintiffs’ claim that BNY Mellon had superior knowledge of Madoff s suspicious activities. To the extent that plaintiffs claim that the Bank acquired actual, as opposed to constructive, knowledge as a result of BNY Mellon’s predecessor’s acquisition of Ivy, the allegations of the amended complaint are wholly conclusory. This claim also ignores that the knowledge of a subsidiary is not imputed as a matter of law to a parent. (See Matter of Scher Law Firm, LLP v DB Partners I, LLC, 97 AD3d 590, 593 [2d Dept 2012], lv denied 20 NY3d 852 [2012]; Defer LP v Raymond James Fin., Inc., 654 F Supp 2d 204, 218 [SD NY *902 2009].) The amended complaint fails, however, to plead factual allegations demonstrating a nexus between the predecessor and any of the defendant entities that would support imputation of Ivy’s knowledge to them. Plaintiffs’ bare assertion that Ivy is “integrated” into the Bank (see oral argument tr at 33) is a plainly insufficient basis on which to impute knowledge to any of the entities named as defendants here.
Plaintiffs’ further claims as to the Bank’s knowledge of Mad-off s wrongdoing, based on Madoff s purchases of BNY Mellon’s own shares and on the Bank’s obligation to monitor the BMIS account, allege not that the Bank had actual knowledge but that it should have had knowledge of Madoff’s activities. Plaintiffs cite no authority that constructive, as opposed to actual, knowledge is sufficient to support a claim of a party’s superior knowledge or to impose disclosure obligations upon it under the special facts doctrine. Moreover, the claim that the Bank should have had superior knowledge about Madoff’s purchases of BNY Mellon shares is inconsistent with the administrative services agreements permitting the Bank to rely, without verification, on information provided by third parties.
As the amended complaint does not adequately allege actual knowledge, the court does not reach the issue of whether the allegations otherwise support application of the special facts doctrine.
It is accordingly hereby ordered that the motion of The Bank of New York Mellon, The Bank of New York Mellon Corporation, and BNY Alternative Investment Services, Inc. to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), and on the ground that plaintiffs lack standing, is granted; and it is further ordered that the complaint is dismissed with prejudice; and it is further ordered that the Clerk of the Court is directed to enter judgment accordingly.

. As used in the amended complaint, BNY Mellon refers to the three defendant entities that are referred to in this decision as BNY Mellon. The amended complaint does not differentiate the entities’ roles. (See amended complaint ¶ 29.) Nor do defendants do so in moving to dismiss.

. The court notes that an issue exists, which the parties have not addressed and the court accordingly does not determine, as to whether the claims may proceed on behalf of classes of plaintiffs that have not been certified under article 9 of the CPLR. CPLR 902 requires that the plaintiff in an action brought as a class action “move for an order to determine whether it is to be so maintained,” and provides that the action may be maintained as a class action only if the specified prerequisites have been met. As noted above, the court in the Tremont action certified the subclasses for settlement purposes only. There is no showing on this record that the District Court’s approval of the assignment is tantamount to certification of the subclasses for purposes of litigation, or that the certification need not be made by this court.

. In view of this holding, the court does not reach the issue of whether the gross negligence cause of action is sufficiently pleaded based, for example, on BNY Mellon’s alleged disregard of the pleaded “red flags” regarding Mad-off’s fraud. (Compare e.g. Saltz v First Frontier, LP, 782 F Supp 2d 61,77 [SD NY 2010], affd 485 Fed Appx 461 [2d Cir 2012]; Zutty v Rye Select Broad Mkt. Prime Fund, L.P., 33 Misc 3d 1226[A], 2011 NY Slip Op 52121[U] [Sup Ct, NY County 2011], with Anwar v Fairfield Greenwich Ltd., 728 F Supp 2d 372, 437 [SD NY 2010].)

. The complaint alleges that BNY Mellon had an obligation under the Bank Secrecy Act (31 USC §§ 5311-5332) to conduct due diligence on BMIS in order to report money laundering transactions to the government; that BNY Mellon had a duty to avoid conflicting loyalties to Madoff and the Rye Funds; and that it failed to disclose its “conflict of interest arising from Madoff s suspicious banking activities,” thereby breaching both its duty of due care and its fiduciary duties. (Amended complaint ¶¶ 59-65.) In opposing defendants’ motion to dismiss, plaintiffs acknowledge that the Bank Secrecy Act did not impose any obligation on BNY Mellon to report to the Rye Funds about the BMIS account. Without withdrawing, or specifically addressing, the pleaded allegations, plaintiffs represent that they do not assert that BNY Mellon breached a duty under the Bank Secrecy Act, and assert generally that their claim is that the Bank breached its fiduciary and common-law duties as cash custodian and administrator to the Rye Funds. (Plaintiffs’ mem in opp at 21.)