■ Dormitory Authority of the State of New York et al., Appellants-Respondents, v Samson Construction Co., Also Known as Samson Construction Co., Inc., Doing Business as Samson Construction Company and Others, Defendant, and Perkins Eastman Architects, P.C., Respondent-Appellant. (And Other Actions.) [27 NYS3d 114]—

Order, Supreme Court, New York County (Eileen Bransten, J.), entered March 1, 2013, which, to the extent appealed from as limited by the briefs, granted the part of defendant Perkins Eastman Architects, P.C.'s (Perkins) motion for summary judgment seeking dismissal of the fifth cause of action, for breach of contract, and denied the part of the motion seeking dismissal of the sixth cause of action, for negligence, modified, on the law, to deny the motion as to the fifth cause of action, and otherwise affirmed, without costs.

In or about 2000, plaintiff City decided to build a state-of-the-art forensic biology laboratory for the Office of the Chief Medical Examiner. The project was designed to be a 15-story structure with a two-level basement, and was to be located on a parcel of city-owned land at the intersection of First Avenue and East 26th Street in Manhattan. The project site was part of the Bellevue Hospital Campus.

The City turned over the project to plaintiff Dormitory Authority of the State of New York (DASNY), a public authority that provides professional services and expertise for the financing and construction of public projects. The City and DASNY then entered into an agreement pursuant to which

DASNY was to manage and finance the planning, design, and construction of the project. DASNY was authorized to contract with consultants, contractors, and a construction manager. It retained Perkins as the architect. Defendant Samson Construction Co. (not a party to this appeal) was hired as the foundation contractor. Samson was responsible for site excavation and the foundation's construction.

In or about May 2002, when Samson began driving piles as part of the foundation work, the adjacent Bellevue building, known as the C&D building, began to settle. The settling of the building continued while the foundation work continued. By March 2004, the C&D Building had settled eight inches in some areas, leading to a delay of the project by more than 18 months. Other structures adjacent to the project site, including sidewalks, roadbeds, sewers, and water systems, also sustained damage due to the settlement during the foundation work. The cost of fixing the damage to the project site and the adjacent properties was approximately $37 million. Perkins ultimately completed its work on the project in February 2007.

The motion court erred in dismissing the breach of contract claim against Perkins. Although Perkins made a prima facie showing that the City is not a third-party beneficiary of the contract because it is not named in the contract, the City raised an issue of fact whether it is an intended third-party beneficiary of the contract (*see MK W. St. Co. v Meridien Hotels*, 184 AD2d 312 [1st Dept 1992]). The contract expressly states that a city agency will operate the DNA laboratory, and the City retained control over various aspects of the project, including participation in and approval of the design of the building, the budget for the project, the selection of contractors, including Perkins, and the construction of the building.

The motion court, however, correctly determined that DASNY may proceed with its negligence claim. Perkins, as architect, may be subject to tort liability based on a failure to exercise due care in the performance of its duties. In making this determination, the court is to look at the nature of the injury and whether the plaintiff is merely seeking the benefit of its agreement. Where the plaintiff is merely seeking the benefit of its agreement, it is limited to a contract claim (*Sommer v Federal Signal Corp.*, 79 NY2d 540, 551-552 [1992]).

Where, however, "[t]he particular project . . . is so affected with the public interest that the failure to perform competently can have catastrophic consequences," a professional may be subject to tort liability as well (*Trustees of Columbia Univ. in City of N.Y. v Gwathmey Siegel & Assoc. Architects*, 192 AD2d

151, 154 [1st Dept 1993]). Indeed, "[t]his is one of the most significant elements in determining whether the nature of the type of services rendered gives rise to a duty of reasonable care independent of the contract itself" (*id.*, citing *Sommer v Federal Signal Corp.*, 79 NY2d 540, 553 [1992]). As the Court explained in *Sommer*, "[I]t is policy, not the parties' contract, that gives rise to a duty of . . . care" (79 NY2d at 552). The "nature of the injury, the manner in which the injury occurred and the resulting harm" are also considered (*id.*, *citing Bellevue S. Assoc. v HRH Constr. Corp.*, 78 NY2d 282, 293-295 [1991] [Court rejected plaintiff's attempt to ground in tort a claim that defendants supplied defective floor tiles, noting that the injury (delamination of tiles) was not personal injury or property damage, there was no abrupt, cataclysmic occurrence, and the injury was simply replacement cost of the product]).

Here, there is a factual question whether Perkins assumed an independent legal duty as an architect to perform its work in a manner consistent with the generally accepted standard of professional care in its industry. DASNY alleges that Perkins's failure to adhere to professional standards of care by not conducting an adequate site investigation and/or providing an adequate foundation design appropriate to the existing site conditions violated the relevant standard of professional care, resulting in increased costs for the project and additional costs of $37 million to remediate the damage caused by the failure to comply with those professional standards. The damage included damage to the sidewalks, roadbeds, sewers, and water systems located near a major medical center in Manhattan. There are issues of fact whether the project was so affected with the public interest that Perkins's failure to comply with the relevant professional standards could result in catastrophic consequences (*Trustees of Columbia Univ.*, 192 AD2d at 154).

The dissent opposes this position on the basis that the damages were not "catastrophic" since the "settling of the building took place gradually over a couple of years and never posed a serious threat to the public's safety." However, the suddenness of the injury is only one factor for the court to consider, and, in any event, a catastrophe does not necessarily have to be a sudden event (*see* Oxford Online Dictionaries, catastrophe ["(A)n event causing great *and often* sudden damage or suffering; a disaster" (emphasis added)]).* The destruction of road beds, sidewalks, sewers and water pipes in a crowded city is a catastrophe and has the potential to lead to catastrophic

---

* Oxford Online Dictionaries, catastrophe (http://www.oxford-dictionaries.com/us/definition/american_english/catastrophe)

consequences (*see Sommer*, 79 NY2d at 552; *see also Duane Reade v SL Green Operating Partnership, LP*, 30 AD3d 189, 189-190 [1st Dept 2006] [tort claim properly made out where it was alleged that "defendant reduced the heat in the building and . . . freezing temperatures caused a sprinkler pipe to burst, resulting in $500,000 in damages to plaintiff's property"]).

Perkins's reliance on the "economic loss" rule is also unavailing. The "economic loss" doctrine does not apply to negligence claims arising out of a violation of a professional duty (*Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 80 AD3d 293, 306 [1st Dept 2010], *affd* 18 NY3d 341 [2011]).

We have considered Perkins's remaining contentions and find them unavailing. Concur—Acosta, Richter and Kapnick, JJ.

Tom, J.P., who dissents in part in a memorandum as follows: While I agree with the majority that the motion court erred in dismissing the breach of contract claim against defendant Perkins Eastman Architects, P.C. (Perkins), I would find that, because plaintiffs are "essentially seeking enforcement of the bargain," the action should proceed under a contract theory (*Sommer v Federal Signal Corp.*, 79 NY2d 540, 552 [1992]), and the cause of action for negligence should be dismissed as duplicative of the cause of action for breach of contract.

This action arises from the construction of a new DNA testing laboratory adjacent to the City's Bellevue Hospital complex in Manhattan. Plaintiff City contracted with plaintiff Dormitory Authority of the State of New York (DASNY) to serve as the project manager. DASNY, in turn, contracted with defendant Perkins to serve as the project's architect.

The contract between DASNY and Perkins required Perkins's designs to be "sufficiently detailed to ensure . . . installation compatibility" and to conform to applicable laws, codes and industry standards. Perkins was also obligated to investigate the site conditions and to supervise and monitor the work of the subcontractors and subconsultants.

Notably, the contract between DASNY and Perkins provides in pertinent part that "[e]xtra costs to [DASNY] resultant from design errors or omissions shall be recoverable from [Perkins] and/or its Professional Liability Insurance carrier."

During the foundation work on the project, and as a result of that work, one of the adjacent Bellevue buildings began to settle into the ground. The adjacent sidewalks, roadbeds, sewers, and water systems sustained damage. Plaintiffs assert claims against Perkins for breach of contract and negligence.

Both causes of action allege identical wrongdoing and additional expenses to the project based on the alleged failures. The only distinction between the two causes of action is that the cause of action for negligence alleges that Perkins "failed to comply with professional standards of care."

Of course, DASNY's allegations of a mere breach of duty of care do not transform its breach of contract claim into a tort claim (see *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 390 [1987]). Moreover, in disentangling tort and contract claims, courts consider "the nature of the injury, the manner in which the injury occurred and the resulting harm" (*Sommer*, 79 NY2d at 552). This Court has described the nature of the harm, particularly whether it is "catastrophic," as "one of the most significant elements in determining whether the nature of the type of services rendered gives rise to a duty of reasonable care independent of the contract itself" (*Trustees of Columbia Univ. in City of N.Y. v Gwathmey Siegel & Assoc. Architects*, 192 AD2d 151, 154 [1st Dept 1993]).

In *Trustees of Columbia*, we found that the professional defendants could be subject to tort liability because the project was "so affected with the public interest" (*id.*). We noted that due to failures of the architect, a large chunk of the facade of a building fell into the complex's courtyard presenting a great danger to an area regularly used by students and pedestrians and requiring emergency safety measures and emergency repairs. We also stated that "[t]he sudden precipitous manner in which the harm in this case occurred adds further support to a finding that a claim lies in tort" (*id.* at 155).

In contrast to the nature of the harm presented in *Trustees of Columbia*, no "catastrophic" harm is or could be alleged in this case. The settling of the building took place gradually over a couple of years and never posed a serious threat to the public's safety. Nor were emergency safety measures or repairs required. Contrary to the majority's assertion, there is no factual issue whether "Perkins's failure to comply with the relevant professional standards could result in catastrophic consequences." The alleged breach of contract by Perkins resulted only in the delay of the project and additional costs expended for repairs to the sidewalks, roadbeds, sewers and water systems as a result of the settling of the foundation of the adjoining building. This damage can hardly be described as "catastrophic." That the project took place near a hospital does not change these crucial facts. Thus, there are no issues of fact presented whether the project was so affected with the public interest that any alleged failure by Perkins resulted in

catastrophic consequences (*see e.g. Verizon N.Y., Inc. v Optical Communications Group, Inc.*, 91 AD3d 176 [1st Dept 2011]).

The majority's position is not aided by reference to the dictionary definition of "catastrophe." While the Oxford Dictionaries' definition does not preclude non-sudden events within the meaning of "catastrophe," the majority can point to no cases sustaining a tort claim where the damage did not occur suddenly. Further, while the suddenness of the injury is only one factor in the analysis, the cases sustaining tort claims involve actual, not hypothetical, threats to the public safety, such as the fire in *Sommer* or the falling chunks of facade in *Trustees of Columbia*. In this regard, it is notable that *Duane Reade v SL Green Operating Partnership, LP* (30 AD3d 189 [1st Dept 2006]), upon which the majority relies, sustained the tort claim because of the "abrupt nature of the injury" (*id.* at 191) and because the landlord's failure to protect the water supply pipes from freezing temperatures as part of a comprehensive scheme of regulations designed to promote fire safety presented a risk to public safety akin to the failure to maintain fire alarms in *Sommer*. We do not have such circumstances in this case.

Accordingly, DASNY cannot claim a legal duty on the part of Perkins independent of Perkins's contractual obligations, and the cause of action for negligence is duplicative and should be dismissed (*see Dormitory Auth. of State of N.Y. v Caudill Rowlett Scott*, 160 AD2d 179 [1st Dept 1990], *lv denied* 76 NY2d 706 [1990]).