KSFB Mgt., LLC v Focus Fin. Partners, LLC (2025 NY Slip Op 50061(U))

[*1]

KSFB Mgt., LLC v Focus Fin. Partners, LLC

2025 NY Slip Op 50061(U)

Decided on January 22, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 22, 2025
Supreme Court, New York County

KSFB Management, LLC, Plaintiff,

against
Focus Financial Partners, LLC, GOLDMAN SACHS & CO. LLC, 
 LEONARD CHANG, and PATRICK FELS, Defendants.

Index No. 650688/2024

Plaintiff KSFB Management — Quinn Emanuel Urquhart & Sullivan LLP
Alex Spiro
Adam Abensohn
Diane Cafferata
Defendants Focus Financial Partners, LLC and Leonard Chang — Susman Godfrey L.L.P.
Kalpana Srinivasan
Oleg Elkhunovich
Monica Daegele
Jacob W. Buchdahl
Scott Glass
Defendants Goldman Sachs & Co. LLC and Patrick Fels — Sullivan & Cromwell LLP
Robert J. Giuffra Jr.
Jonathan S. Carter
Alexander N. Gross

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (MS005) 41, 42, 43, 44, 45, 46, 47, 48, 49, 61, 85 were read on this motion to/for DISMISSAL.
Plaintiff KSFB Management, LLC (KSFB) brings this action against Focus Financial Partners, LLC (Focus), Goldman Sachs & Co. LLC (Goldman Sachs), Leonard Chang, and Patrick Fels (collectively, defendants), asserting claims in connection with an alleged scheme by defendants to distract KSFB into pursuing a combined sale of KSFB and Focus's wholly owned subsidiary, NKSFB, LLC (NKSFB), while defendants secretly consummated a purportedly [*2]competing transaction without KSFB. Presently before the court [FN1]
is defendants' motion, pursuant to CPLR 3211(a)(7), for an order dismissing the complaint (NYSCEF # 41). KSFB opposes the motion. The court held oral arguments on defendants' motion on December 19, 2024, reserving its decision at the conclusion of the hearing (see NYSCEF # 101 — Hr'g tr 67:11-20). This Decision & Order now follows. As explained below, defendants' motion is granted.
Background
Factual Background
The following facts are drawn from the Complaint (see NYSCEF # 2 — Complaint or compl), its accompanying exhibits, and documents incorporated in it by reference. They are accepted as true solely for purposes of resolving this motion. The Formation of KSFB and NKSFB
i. The Formation of KSFB and NKSFB
The foundation of the parties' dispute dates back to 1981, when Fred Nigro, Michael Karlin, and Mark "Mickey" Segal started the accounting firm of Nigro Karlin & Segal (compl ¶¶ 2, 28). Eventually becoming Nigro Karlin Segal Feldstein & Bolno LLC (Nigro Karlin), the firm developed itself into a highly-regarded business management company providing concierge-style business management services to high-net-worth individuals (see id. ¶¶ 2, 28-29).
On April 1, 2018, after several decades of carefully cultivating and nurturing relationships and trust with its clients, Nigro Karlin and its principles sold its assets—including employees, revenue, and operating expenses—to defendant Focus Financial Partners, LLC (Focus), an investor in fiduciary wealth and business management firms (compl ¶¶ 3, 30). Nigro Karlin's assets were placed into a new, wholly owned subsidiary of Focus called NKSFB (id.). Simultaneously, the principals of Nigro Karlin formed plaintiff KSFB (id.). Sometime following the sale of Nigro Karlin, KSFB and Focus then entered into a Management Agreement pursuant to which KSFB would provide management services to facilitate NKSFB's business of providing family office, business management, consulting, tax, and other client services (the NKSFB Business) for a fee calculated based on NKSFB's profits (id. ¶¶ 4, 31; see also NYSCEF # 44 — Management Agreement [FN2]
). This arrangement continued for a number of years, allowing NKSFB [*3]to grow into Focus's most valuable business management asset (compl ¶¶ 4, 31).
ii. Focus's Alleged Scheme to Sell NKSFB and Prevent KSFB From Entering the Market
By early 2022, the principals of KSFB were considering future opportunities in anticipation of the expiration of a non-competition period in 2023 (compl ¶ 32). As its principals considered their options, KSFB proposed having Focus purchase KSFB's business (id.). Conversely, if Focus was not interested, KSFB advised that they would offer KSFB for sale elsewhere in the market or start a business to compete in the same market as NKSFB (id.).
Unbeknownst to NKSFB, Focus wanted to capitalize on NKSFB's success and was working, together with its long time investment adviser, Goldman Sachs, to sell itself and NKSFB in a deal with a third party (compl ¶¶ 5-6, 33, 39). By June 2022, several investors had expressed interest in such an acquisition, including, as is relevant here, Clayton Dubilier & Rice LLC (CD&R) (see id.). KSFB alleges that Focus understood that the departure of either KSFB or its principals would undermine or devalue any potential deal with CD&R or other investors (id. ¶¶ 6, 33). As a result, Focus was determined to prevent KSFB from leaving its management role with NKSFB, and it pursued various strategies in furtherance of that goal (see id. ¶¶ 6, 33-34).
At first, Focus threatened and intimidated KSFB (see compl ¶¶ 7, 35). When that approach did not work, Focus embraced KSFB's earlier proposal that Focus purchase KSFB (id. ¶¶ 7, 36). Specifically, in June 2022, Focus's cofounder and representative, Chang, communicated to KSFB's Managing Partner, Segal, that such a purchase was a "great idea," and thus, although KSFB was initially reluctant, the parties began working to negotiate deal terms (id.).
On September 1, 2022, Focus again changed course, instead proposing that Focus and KSFB team up to pursue a joint sale with KSFB of the NKSFB Business (the Joint NKSFB Sale) (compl ¶¶ 8, 36). In furtherance of this new proposal, Focus urged KSFB to retain Goldman Sachs to advise and assist with the joint sale (compl ¶ 37). Initially, KSFB was opposed to Goldman Sachs's involvement, citing concerns of a potential conflict of interest in having Goldman Sachs jointly representing KSFB and Focus (see id. ¶¶ 37-38). Nonetheless, over time, KSFB was convinced by defendant Fels, Goldman Sachs's Head of FIG Americas, that Goldman Sachs, Focus, and KSFB were fully aligned on the same goals (see id. ¶¶ 38-40). KSFB therefore agreed in principle for Goldman Sachs to serve as its representative for the Joint NKSFB Sale (see id.). But as noted above, and as further explained below, KSFB contends that Goldman Sachs's representations ultimately proved to be false because it was secretly engaged with Focus to find a buyer for Focus and the NKSFB Business without KSFB (id. ¶ 39).
iii. KSFB Enters Into the NDA with Godman Sachs and Focus
With an agreement to have Goldman Sachs serve as its representative in place, KSFB spent five weeks negotiating a three-way non-disclosure agreement with Goldman Sachs and Focus (see compl ¶ 13, 40; NYSCEF # 3 — NDA). The "Purpose" of entering the NDA was to allow the parties to share confidential information so they could "pursu[e] a possible relationship between [Goldman Sachs] and [KSFB and Focus] in which [Goldman Sachs] may advise and assist with respect to a possible strategic transaction involving [NKSFB]" (compl ¶ 41; NDA at preamble).
Under the NDA, Goldman Sachs agreed to "keep the Confidential Information confidential," and therefore, it would not, "without prior written consent of [Focus and KSFB], (i) use, for itself or on behalf of any other person, any portion of the Confidential Information for any purpose other than the Purpose, or (ii) disclose any portion of the Confidential Information to any person, other than . . . in connection with the Purpose" (compl ¶ 41; NDA ¶ 2). "Confidential Information," in turn, was defined under the NDA as "all oral, written or digital information furnished by or on behalf of [Focus or KSFB] to [Goldman]" in connection with the Joint NKSFB Sale, "whether furnished before or after the date hereof" (compl ¶ 42; NDA ¶ 1). Such information included "the identity of [Focus or KSFB] and/or the identity of the [NKSFB] or any other affiliate . . . and/or the fact that [Focus or KSFB] or its affiliates may be considering a possible strategic transaction" (compl ¶ 42; NDA ¶ 1). It further encompassed "material provided directly by [NKSFB] or any other affiliate, agent or representative of [Focus or KSFB]" (compl ¶ 42; NDA at preamble). This definition of "Confidential Information," however, did not include information that "was known by [Goldman Sachs]" at the time of disclosure by either Focus or KSFB (NDA ¶ 1).
In addition to the above protections, the NDA also provided that
[Focus and KSFB] will be granted access to any electronic dataroom or other file sharing platform used to share Confidential Information with [Goldman Sachs]. For the avoidance of doubt, any Confidential Information of another party received or accessed by a party, whether provided by [Goldman Sachs, Focus, or KSFB], contained in a data room or otherwise, shall be used by such party only for the purposes of a mutually agreeable strategic transaction assisted by [Goldman Sachs] and any such sharing or disclosure by a party shall not constitute a license to use or any transfer of ownership or other rights with respect to such Confidential Information or any waiver or grant of use of such Confidential Information for any other purpose
(compl ¶ 43; NDA ¶ 8).
According to KSFB, it negotiated these provisions to prevent Focus or Goldman Sachs from using KSFB's confidential information for anything other than the Joint NKSFB Sale (see compl ¶¶ 40, 43). KSFB also claims that it wanted to ensure that, if it was going to engage in a process with Focus and Goldman Sachs, then those entities could not go behind its back and use its confidential information in a separate deal excluding KSFB (see id. ¶¶ 40, 45).
iv. KSFB, Focus, and Goldman Sachs Proceed with the Joint NKSFB Sale, While Focus and Goldman Sachs Pursue a Separate Deal with CD&R
KSFB began sharing information with Goldman Sachs about the NKSFB Business and its financials in order to provide Goldman Sachs with a deep knowledge of the business and, in turn, facilitate a potential sale (compl ¶ 47). In purportedly keeping up a pretense that Focus and Goldman Sachs were committed to such a transaction, Goldman Sachs began advising Focus and KSFB through the process of identifying buyers and soliciting their bids (see id. ¶¶ 48-50). Through this process, Goldman Sachs identified over two dozen potential buyers for the NKSFB Business, and it set up various in-person meetings with these buyers throughout December 2022 and into January 2023 (id. ¶¶ 51-53). Notably, KSFB alleges, Goldman Sachs never identified CD&R as a potential buyer for the Joint NKSFB Sale (see id. ¶ 50). The reason why, KSFB posits, is because, as explained above, Goldman Sachs and Focus were simultaneously seeking to secure a deal with CD&R for the sale of Focus and NKSFB (but not KSFB) (see id. ¶¶ 50, 55).
According to KSFB, Focus and Goldman Sachs's efforts to secure a deal with CD&R began in March 2022, when Focus's Board of Directors (the Board) met with Goldman Sachs to discuss long-term strategic goals and plans for the company, including a potential sale of Focus (see compl ¶ 55). In June 2022, after the Board approved a study of potential financing and strategic opportunities, Focus met with representatives of CD&R to discuss a potential acquisition, and thus a contemplated sale process was fully underway (see id. ¶¶ 56-58).
Eventually, on September 14, 2022, CD&R submitted its first written offer to acquire Focus (compl ¶¶ 59-60). This offer came just two days prior to Focus and Goldman Sachs's convincing KSFB to hire Goldman Sachs for the Joint NKSFB Sale (id.). Although it did not accept the offer, the Board authorized additional due diligence materials to be made available to CD&R, including Focus's long-term financial projection and, as alleged upon KSFB's information and belief, KSFB's confidential information provided pursuant to the NDA (see id. ¶¶ 59, 61, 63).
KSFB maintains that, with CD&R now receiving non-public due diligence materials, Focus and Goldman continued its "secret" negotiations with CD&R while simultaneously negotiating terms of the NDA with KSFB (see id. ¶¶ 63, 67). And by late January 2023, Focus and Goldman Sachs were purportedly nearing a definitive deal with CD&R (id. ¶ 66). At no point, KSFB avers, did either Focus or Goldman Sachs disclose their negotiation efforts with CD&R (see id. ¶ 67). KSFB alleges that they instead went through the motions to ensure that KSFB remained aligned with NKSFB so as to retain CD&R's interest in purchasing Focus and NKSFB (see id.).
v. KSFB Enters Into an Engagement Letter with Goldman Sachs
According to KSFB, Focus and Goldman Sachs were aware that KSFB had no knowledge of its secret negotiations with CD&R and, if those negotiations were discovered, they would be exposed to significant liability (see compl ¶ 68). As a result, on January 25, 2023, Goldman Sachs insisted that KSFB sign an engagement letter with it (see id. ¶ 69; NYSCEF # 4 — the Engagement Letter or EL). This Engagement Letter came just days prior to Focus and CD&R entering an exclusivity agreement (compl ¶ 72).
In the Engagement Letter, Goldman Sachs continued to represent that it was "exclusively engaged" by Focus and KSFB as "financial advisor in connection with the possible sale of all or a portion of (i) NKSFB . . . and/or (ii) KSFB" (compl ¶ 69; EL at 1). The parties then agreed that
(i) Goldman Sachs will advise [Focus and KSFB] on a collective basis,
(ii) that no Company will be advised independently of the other,
(iii) that Goldman Sachs will not negotiate for one Company against the other with respect to any issue which may arise in connection with the transaction and (iv) unless otherwise directed in writing . . . Goldman Sachs may share any information it receives from one Company with any other Company
(compl ¶ 73; EL at 1). But notwithstanding these acknowledgments, each party to the Engagement Letter also expressly agreed that "Goldman Sachs[] may currently be providing and may in the future provide financial advisory and/or other investment banking services that could impact the transaction contemplated by this letter" (EL at 1-2).
Separately, the Engagement Letter included various terms that, in KSFB's view, were intended to insulate Goldman Sachs from liability (compl ¶ 74). For example, the Engagement letter stated that Focus and KSFB "understand[] and acknowledge[] that potential conflicts of interest, or a perception thereof, may arise as a result of" Goldman Sachs's representation of both Focus and KSFB, and thus the parties agreed that such a situation "will not give rise to any claim of conflict of interest against Goldman Sachs" (EL at 1). The Engagement Letter further provided that "nothing in this letter or the nature of [Goldman Sachs's] services in connection with this engagement or otherwise shall be deemed to create a fiduciary duty or fiduciary or agency relationship between" Goldman Sachs and Focus and KSFB, and "each of [Focus and KSFB] agrees that it shall not make, and hereby waives, any claim based on an assertion of such a fiduciary duty or relationship" (id. at 4).
KSFB maintains that, by the time it signed the Engagement Letter, it had been led to believe that Focus and Goldman Sachs were genuinely committed to a joint transaction (compl ¶ 71). It insists that it reasonably relied on defendants' conduct, including their purported assurances that Focus and Goldman Sachs were committed to the Joint NKSFB Sale, and signed the Engagement Letter (id. ¶ 75).
vi. After Signing the Engagement Letter, KSFB Discovers the CD&R Transaction
On February 2, 2023, Segal received an email sent to all Focus partner firms (except KSFB) (compl ¶ 81). From that email, as well as a press release, Segal and KSFB discovered that, unbeknownst to KSFB, Focus had entered into an exclusivity agreement with CD&R to negotiate the terms of a definitive agreement for CD&R to acquire Focus at $53 per share (see id. ¶¶ 81-82).[FN3]
KSFB further avers that such a deal would necessarily have involved NKSFB (id. ¶ 81).
Several weeks later, on February 27, 2023, Focus issued a second press release revealing that it had reached a definitive agreement for CD&R to acquire Focus in an all-cash transaction with an enterprise value of $7 billion (compl ¶ 82; NYSCEF # 46). It is through this press release that KSFB contends it learned that Goldman Sachs was acting as Focus's financial advisor for [*4]this "secret" transaction while simultaneously searching for a prospective buyer for the NKSFB Business (compl ¶ 82). KSFB alleges that the CD&R transaction necessarily relied on KSFB's confidential information so as to sell Focus on the most favorable terms possible, and it also directly conflicted with joint sale of the NKSFB Business by including one of the assets that were contemplated in that potential transaction (id. ¶¶ 83-84).
KSFB maintains that, by stringing it along for months until the CD&R acquisition closed, Focus and Goldman enriched themselves at KSFB's expense (see compl ¶¶ 86-87). KSFB further explains that Focus and KSFB had substantially similar business profiles, and thus defendants' conduct spoiled the market for a transaction involving the NKSFB Business or KSFB (see id. ¶¶ 88-92).

 Legal Standard
A party may move for dismissal under CPLR 3211(a)(7) when a pleading "fails to state a cause of action." On such a motion, the court "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord plaintiffs the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (Whitebox Concentrated Convertible Arbitrage Partners, L.P. v Superior Well Servs., Inc., 20 NY3d 59, 63 [2012]). Whether a plaintiff can ultimately establish its allegations is not considered when determining a motion to dismiss (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]).

Discussion
KSFB commenced this action on February 8, 2024, asserting claims for (i) breach of the NDA against Focus and Goldman Sachs (Count I); (ii) breach of the covenant of good faith and fair dealing against Focus and Goldman Sachs (Count IV); (iii) fraudulent concealment, misrepresentation, and inducement against all defendants, as well as declaratory judgment regarding the enforceability of the allegedly fraudulently induced Engagement Letter (Counts VI, VII, & IX — the Fraud-Based Claims); (iv) breach of fiduciary duty against Goldman Sachs and aiding and abetting breach of fiduciary duty against Focus, Chang, and Fels (Counts II & III); (v) tortious interference with prospective economic advantage (Count V); and (vi) unjust enrichment (Count VIII) (NYSCEF #s 1-2). Defendants no move to dismiss each of these claims (NYSCEF # 41). The court addresses each of defendants' bases for dismissal below.
I. Breach of Contract (Count I)
KSFB's breach of contract claims is premised on purported breaches of Paragraphs 2 and 8 of the NDA (compl ¶¶ 98-109). Now, in moving to dismiss, defendants contend that KSFB has failed to allege a breach of either provision (NYSCEF # 42 — MOL at 25-26; NYSCEF # 85 — Reply at 13-14). With regard to that portion of KSFB's claim relying on Paragraph 2, defendants maintain that KSFB's allegations are impermissibly speculative (MOL at 25). And as for that portion of KSFB's claim focused on Paragraph 8, defendants maintain that KSFB's allegations are foreclosed by the plain terms of the NDA (id. at 26). But, KSFB counters that it has set forth more than enough detail to plausibly allege actionable breaches of both of these provisions of the NDA (see NYSCEF # 61—Opp at 10-13).
KSFB claims that Paragraph 2 of the NDA was breached when KSFB's confidential information was used for a purpose other than the Joint NKSFB Sale (compl ¶¶ 98-105). As relevant here, under Paragraph 2, Goldman Sachs agreed to "keep the Confidential Information confidential, and will not, without prior written consent of [Focus and KSFB], (i) use, for itself or on behalf of any other person, any portion of the Confidential Information for any purpose other than the Purpose, or (ii) disclose any portion of the Confidential Information to any person, other than . . . in connection with the Purpose" (NDA ¶ 2). That "Purpose," in turn, was to allow the parties to share confidential information so they could "pursu[e] a possible relationship between [Goldman Sachs] and [KSFB and Focus] in which [Goldman Sachs] may advise and assist with respect to a possible strategic transaction involving [NKSFB]" (compl ¶ 41; NDA at preamble). Relying on these provisions, KSFB maintains that it shared confidential information with Goldman Sachs so as to provide Goldman Sachs with "deep knowledge" of the NKSFB Business for purposes of the Joint NKSFB Sale (compl ¶¶ 14-16, 47-54, 63). But rather than use this information solely for the Joint NKSFB Sale, KSFB avers that Goldman Sachs disclosed KSFB's confidential information to CD&R (see id. ¶¶ 61, 63 80, 83, 150).
Notwithstanding these allegations, KSFB's claim, insofar as premised on a breach of Paragraph 2, suffers from a fundamental flaw: it does not identify what, if any, confidential information was disclosed by either Goldman Sachs or Focus to CD&R (or any other third party, for that matter). Such a glaring omission ultimately warrants dismissal of this portion of KSFB's breach of contract claim (see Art Capital Group, LLC v Carlyle Inv. Mgt. LLC, 151 AD3d 604, 605 [1st Dept 2017] [affirming dismissal of breach of a confidentiality agreement claim were "plaintiff [did] not identify what confidential information was allegedly misused"]).
To be sure, KSFB does aver that, in pursuing the Joint NKSFB Sale, it described the NKSFB Business to Focus and Goldman Sachs by (1) explaining "what we do and how we do it," (2) walking through unspecified financials of the NKSFB Business, (3) discussing the NKSFB Business's operations and its principals' compensation, and (5) defining unspecified "specific services" KSFB provided to clients (see compl ¶¶ 47, 83). These allegations, however, do nothing to salvage KSFB's claim.
To start, KSFB's description of the information shared with Goldman Sachs and/or Focus is far too vague and ambiguous to allow the court to even infer that this purported information was confidential in nature, let alone that it was shared with CD&R (cf. Garda USA, Inc. v Sun Capital Partners, Inc., 2020 WL 6564731, at *2 [Sup Ct, NY County, Nov. 9, 2020], mod on other grounds 194 AD3d 545 [1st Dept 2021] [denying motion to dismiss claim for breach of a confidentiality agreement where plaintiff alleged that defendants "divulged to [a third party] highly sensitive information regarding the [parties'] Transaction, including the existence or terms of the Letter Agreement, the expiration of exclusivity under the Letter Agreement, and the pricing and/or timing of the Transaction" in violation of confidentiality agreement prohibiting disclosure of the "identity of the parties hereto . . . or the existence or contents of this letter agreement) or any documents relating thereto, and/or any discussions related to any of the foregoing'"]).
At any rate, even if its descriptions were more particularized, KSFB also fails to explain how, if at all, any of the information shared with Focus and Goldman Sachs would have fallen within contractual definition of Confidential Information under the NDA. As counsel for defendants Focus and Chang persuasively noted during oral arguments (see Hr'g tr 41-:25-43:7), this failure by KSFB to make this connection in the Complaint is particularly problematic [*5]because Focus, through NKSFB, owns the assets underlying the NKSFB Business (see compl ¶¶ 3, 30) and therefore owns much of the confidential information related to the NKSFB Business (see Management Agreement § 2.10; generally Gordon v Dino De Laurentiis Corp., 141 AD2d 435, 436 [1st Dept 1988] [holding that plaintiffs did not identify any confidential information other than information that was already in defendant's possession]). In view of this point, and in the absence of any clarification in KSFB's allegations or submissions, it is certainly possible that some, if not all, of the information shared by KSFB would have fallen within NDA's express exceptions of what constitutes "Confidential Information" (see NDA ¶ 1). Consequently, the Complaint here is not sufficiently particular to give adequate notice of the "transactions, occurrences, or series of transactions or occurrences" underlying KSFB's breach-of-contract claim arising out of a breach of Paragraph 2 of the NDA (see CPLR 3013).
Turning to KSFB's breach of contract claim premised on Paragraph 8, dismissal is also warranted. Under Paragraph 8, Focus and KSFB were to "be granted access to any electronic dataroom or other file sharing platform used to share Confidential Information with [Goldman Sachs]" (NDA ¶ 8). Relying on this language, KSFB contends that Goldman Sachs and Focus breached this provision by failing to provide KSFB with access to the CD&R virtual data room (compl ¶¶ 106-109). But nothing in Paragraph 8 supports a conclusion that KSFB was ever entitled to access to information in CD&R's dataroom or to otherwise receive information shared between Goldman Sachs and Focus for purposes of the CD&R transaction. Rather, the plain purpose of Paragraph 8 was to make available to Focus and KSFB any Confidential Information provided to Goldman Sachs related to the "mutually agreeable transaction" contemplated by the NDA (see id. ¶¶ 1, 8 & Preamble). And as clearly established by the NDA—including a review of the relevant definition of "Confidential Information" contained therein—that "mutually agreeable transaction" was the strategic transaction involving the NKSFB Business to the extent it involved both Focus and KSFB, i.e., the Joint NKSFB Sale (see NDA ¶ 1 & Preamble). Put succinctly, nothing in the NDA suggests, as KSFB seemingly argues, that the parties contemplated expanding KSFB's information rights beyond the dataroom established for the Joint NKSFB Sale.[FN4]

Defendants' motion to dismiss KSFB's breach of contract claim is granted.
II. Breach of the Covenant of Good Faith and Fair Dealing (Count IV)
The next cause of action targeted by defendants' motion to dismiss is KSFB's claim that Goldman Sachs and Focus breached the NDA's implied covenant of good faith and fair dealing (MOL at 27-28; Reply at 15-16). In support of dismissal, defendants contend that KSFB's implied covenant claim improperly creates an obligation that is not found in the NDA by essentially creating a de facto exclusivity agreement between KSFB, Focus, and Goldman Sachs (MOL at 27-28).
"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance" (Atlas El. Corp. v United El. Group, Inc., 77 AD3d 859, 861 [2d Dept 2010]). Pursuant to this implied covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (id.). Yet, "[w]hile the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights" (Fesseha v TD Waterhouse Inv. Servs., Inc., 305 AD2d 268, 268 [1st Dept 2003]). Nor can one party invoke the duty of good faith to imply obligations inconsistent with the terms of the contractual relationship (see Gottwald v Sebert, 193 AD3d 573, 582 [1st Dept 2021]; Sheth v NY Life Ins. Co., 273 AD2d 72, 73 [1st Dept 2000]). Ultimately, "'a party who asserts the existence of an implied-in-fact covenant bears a heavy burden' to 'prove not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole'" (Singh v City of New York, 40 NY3d 138, 146 [2023], quoting Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69 [1978]).
Here, the crux of KSFB's implied covenant claim is that, under the NDA, Focus and Goldman Sachs could not undertake "any actions that would create or pursue a secret conflict with the joint sale" (compl ¶ 143). Hence, KSFB posits that under the NDA, Goldman Sachs and Focus were prohibited from engaging in conflicting negotiations with CD&R and others to sell Focus/FFPI while simultaneously pursuing the Joint NKSFB Sale (id.). This contention is without merit. If the court accepted KSFB's position, it would improperly create an independent contractual obligation outside the original scope of the NDA. This conclusion is buttressed by the plain terms of the NDA itself, which provides that the "Purpose" of the NDA was to facilitate the sharing of information so that the parties could "pursu[e] a possible relationship between" Goldman Sachs, Focus, and KSFB (NDA at Preamble). Given this express "Purpose," there is plainly no basis to conclude that such a de facto exclusivity agreement is implicit in the NDA (see Singh, 40 NY3d at 146). Accordingly, neither Goldman Sachs nor Focus breached the NDA's implied covenant by pursuing the CD&R transaction.
Defendants' motion to dismiss KSFB's implied covenant claim is granted.
III. Fraud-Based Claims (Counts VI, VII, & IX)
Defendants next seek dismissal of Counts Six, Seven, and Nine of the Complaint, i.e., the Fraud-Based Claims. These Fraud-Based Claims can be separated into two distinct categories across the three causes of action. The first category relates to defendants' alleged misrepresentations that "there was 'no conflict'" in having Goldman Sachs serve as KSFB's and Focus's investment advisor (the No Conflicts Representation) (see compl ¶¶ 156, 164, 179). The second misrepresentation relates to defendants creating a false impression that Focus and Goldman Sachs were exclusively engaged in the process of soliciting bidders for the Joint NKSFB Sale (the Exclusive Engagement Representation) (see id. ¶¶ 156-157, 165, 167, 180, 182). KSFB maintains that these categories of alleged misrepresentations and/or omissions ultimately caused it to move forward with the Joint NKSFB Sale and induced it to enter into the Engagement Letter (see id. ¶¶ 158-159, 165-170, 181, 183-185).
Defendants argue that KSFB's Fraud-Based Claims fail because the purported misrepresentations alleged by KSFB were contradicted by express disclaimers in the [*6]Engagement Letter, and, in any event, KSFB's fraud claims fail to allege a duty to disclose or intent to deceive (MOL at 18-25; Reply at 4-9). KSFB responds that it has pleaded fraud with sufficient particularity and that the majority of defendants' bases for dismissal of the Fraud-Based Claims hinge on questions of fact that cannot be resolved on a motion to dismiss (Opp at 13-19). Furthermore, in addressing defendants' contention that the Engagement Letter's contractual disclaimers preclude liability, KSFB asserts that, if the Engagement Letter was, as alleged, induced by fraud, such disclaimers are voidable, and in any event, its disclaimers do not track the substance of its claims (id. at 19-23).
To state a claim for fraud, a complaint must allege a representation or omission of a material fact, falsity, scienter, reliance, and injury (see Albert Apt. Corp. v Corbo Co., 182 AD2d 500, 500 [1st Dept 1992]). Similarly, a claim premised on fraudulent inducement requires "specific statement[s] made by defendants (or by anyone else) that would have fraudulently induced the contract" (see EVUNP Holdings LLC v Frydman, 225 AD3d 469, 469 [1st Dept 2024]). Put differently, to state a claim for fraudulent inducement, a plaintiff must allege "(1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury" (see CANBE Props., LLC v Curatola, 227 AD3d 654, 656 [2d Dept 2024]).
Here, KSFB's Fraud-Based Claims fail for several reasons. To start, KSFB has not plausibly alleged justifiable reliance on defendants' purportedly false representations and omissions because any such reliance is belied by the specific disclaimers regarding conflicts and exclusivity set forth in the Engagement Letter (see Suber v Churchill Owners Corp., 228 AD3d 414, 415 [1st Dept 2024] ["specific disclaimers . . . [may] bar claims arising out of reliance on purported representations"]). For example, in asserting claims related to the No Conflicts Representation, KSFB alleges that defendants falsely represented to KSFB that Goldman Sachs had "no conflict" for purposes of jointly representing KSFB and Focus as their adviser (see compl ¶¶ 156, 164). That No Conflict Representation allegedly turned out to be false because Goldman Sachs was "secretly" representing Focus in the separate CD&R transaction, which also involved selling the NKSFB Business to another party (see id. ¶¶ 74[a], 75). And had it known the truth, KSFB avers, it would not have pursued the joint sale with Goldman Sachs or otherwise entered into the Engagement Letter (see id. ¶¶ 159-160, 168).
KSFB, however, cannot plausibly allege that it relied on the No Conflicts Representation when Goldman Sachs's conflict was seemingly contemplated in the Engagement Letter. Specifically, as part of the Engagement Letter, KSFB expressly agreed that "potential conflicts of interest, or a perception thereof, may arise as a result of [Goldman Sachs] rendering services to" Focus and KSFB, and that the interests of Focus and KSFB "may not always be aligned" (EL at 1). Then, as the Engagement Letter further clarified, Goldman Sachs's financial advisory services were intended to cover a "possible sale of all or a portion of" the NKSFB Business "and/or" KSFB (id. [emphasis added]). These are not, as KSFB suggests, mere boilerplate disclaimers. To the contrary, construed in the context of the entire Engagement Letter, these representations contemplated the exact conflict at the center of KSFB's claims, i.e., a situation wherein Goldman Sachs, in the course of advising to Focus in the Joint NKSFB Sale, could advise on other potential options favorable to Focus, but not necessarily KSFB, regarding a contemplated sale of "all or a portion of" the NKSFB Business (EL at 1). Consequently, the Engagement Letter's specific and unambiguous conflict-of-interest disclaimer necessarily defeats [*7]KSFB's fraud claims premised on the No Conflicts Representation (Fifth Partners LLC v Foley, 227 AD3d 543, 543-544 [1st Dept 2024] [holding that disclaimers in an agreement "destroy[] the allegations . . . that the agreement was executed in reliance upon these contrary oral representations" [alterations in original]]).
Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc. (115 AD3d 128 [1st Dept 2014]), a case cited by KSFB during oral arguments, does not warrant a different outcome. In Basis Yield Alpha, plaintiff commenced a series of actions against defendant arising from its investments in certain subprime mortgage-linked securities, asserting, among other things, claims premised on fraudulent concealment and fraudulent inducement (id. at 131). As alleged, defendant was accused of selling mortgage-backed securities it knew to be "junk" and then betting against the same securities as the 2007 financial crisis unfolded (id. at 131). In seeking dismissal of plaintiff's fraud-based claims, defendant relied on certain disclaimers and disclosures in its offering circulars, which it contended were applicable to the information that was either misrepresented or undisclosed related to the mortgage-backed securities (id. at 137). One such disclosure was that one of defendant's affiliates would "'act as the sole Synthetic Security counterparty,' which would 'create a conflict of interest'" (id. at 138).
The First Department rejected defendant's argument, explaining that its disclosures "simply provide[d] boilerplate statements regarding the speculative and risky nature of investing in mortgaged-backed [collateralized debt obligations]," whereas plaintiff's claims were far broader and more specific insofar as it claimed that defendant was aware it was selling toxic assets, failed to disclose to sales to investors, and sought to profit from its own actions (id.). Thus, the First Department concluded, there was a "vast gap" between the "speculative picture" painted by defendant in its offerings and the "events [defendant] knew had already occurred" (id.). Here, by contrast, there is no similar "gap" between the conflict-of-interest disclosures in the NDA and the No Conflicts Representation. Rather, as explained above, KSFB's allegations are closely aligned with the scope of conflicts set forth in the NDA's disclosures (cf. compl ¶ 74[a] [alleging that the Engagement Letter "specifically purports to eliminate liability for 'any claim of conflict of interest against Goldman Sachs'" so as to insulate it from liability claims that "[d]efendants engaged in the joint sales process for the NKSFB Business despite substantial and significant conflicts of interest stemming from their participation in a secret and separate sales process to sell NKSFB to another party"]).
KSFB's Fraud-Based Claims premised on the Exclusive Engagement Representation are similarly precluded by plain terms of the Engagement Letter. As KSFB alleges, the crux of the Exclusive Engagement Representation is that Focus and Goldman Sachs had claimed to KSFB that they were exclusively engaged in soliciting bidders for the Joint NKSFB Sale (see compl ¶¶ 157, 164). Yet in reality, they were attempting to find a buyer for Focus and the NKSFB Business without involving KSFB (id.). As a result, by leading KSFB along in this fashion, KSFB avers, defendants actively misled KSFB to its detriment (id. ¶¶ 157, 165).
But like the No Conflicts Representation, this situation was also expressly contemplated by the parties in the Engagement Letter. Indeed, KSFB specifically acknowledged in the Engagement Letter that Goldman Sachs "may currently be providing and may in the future provide financial advisory and/or other investment banking services that could impact the transaction contemplated by this letter" (EL at 1-2). Again, this is not a boilerplate disclaimer that is untethered to the claims at issue in this litigation. Rather, this disclaimer is clear and specific, and it plainly contemplates the situation about which KSFB now complains. Given this [*8]clear language, KSFB cannot now plausibly allege that it was led to believe that the Joint NKSFB Sale was the only and exclusivetransaction being contemplated by Goldman Sachs and Focus when it signed the Engagement Letter and agreed to continue pursuing the Joint NKSFB Sale (see First Inter-County Bank of NY v DeFilippis, 160 AD2d 288, 290 [1st Dept 1990] ["specific and unambiguous disclaimers contained in the agreement, concerning the [subject matter of plaintiff's fraud claim], operate as a bar to defendant's claim of fraud in this regard"]).
Next, even if the Engagement Letter did not bar KSFB's Fraud-Based Claims, they would still be dismissed insofar as they are based on a concealment or omission theory. For claims premised on fraudulent concealment or omissions, a complaint must also allege a duty to disclose (Kaufman v Cohen, 307 AD2d 113, 119-120 [1st Dept 2003]). This requires a showing of a fiduciary relationship or some other circumstances establishing an affirmative duty to disclose material facts (see SNS Bank v Citibank, 7 AD3d 352, 356 [1st Dept 2004 ["an omission does not constitute fraud unless there is a fiduciary relationship between the parties"]). Generally, there is no duty to disclose in a transaction that is "at arm's length, between sophisticated commercial parties . . . ." (see Cobalt Partners, L.P. v GSC Capital Corp., 97 AD3d 35, 42-43 [1st Dept 2012]). That is the issue here.
The Complaint paints a picture of a quintessential arm's length transaction involving sophisticated parties with an extensive history and business relationship exploring the possibility of a joint sale of the NKSFB Business (see generally compl ¶¶ 28-31, 36-39, 47, 49-54). There is nothing alleged that supports a conclusion, or even reasonable inference, that Goldman Sachs, Focus, or either's principals, had a fiduciary relationship with KSFB or that there was some other affirmative duty to disclose material facts to KSFB as part of the Joint NKSFB Sale.
In opposition, KSFB appears to suggest that defendants had "superior knowledge" of their participation in a competing transaction, and thus were obligated to disclose that information to it. The court disagrees. It is true, of course, that a duty to disclose exists where a party has superior knowledge of certain information (see Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, 57 F3d 146, 155 [2d Cir 1995]). But, as the First Department has observed, "superior knowledge of . . . alleged wrongdoing . . . and . . . admitted wrongdoing is not the type of unique or specialized expertise that would" give rise to a duty to disclose information (RKA Film Fin., LLC v Kavanaugh, 171 AD3d 678, 680 [1st Dept 2019] [alterations in original]). And to establish a "special relationship" mandating disclosure of information acquired through "superior knowledge," a plaintiff must allege that the defendant is a "person[] who possess[es] unique or specialized expertise, or who [is] in a special position of confidence and trust" (Kimmell v Schaefer, 89 NY2d 257, 263 [1996]). Here, by contrast, there is no such "special relationship" alleged in or even reasonably inferred from the Complaint.
None of the cases cited by KSFB warrant a different conclusion. For example, Huang v Sy (18 Misc 3d 1141[A] [Sup Ct, Queens County, 2008]) squarely presented a situation where defendant possessed unique or specialized expertise so as to create the requisite special relationship between plaintiffs and defendant giving rise to a corresponding duty to disclose. Specifically, Huang involved a claim that defendant had induced his longtime friends and neighbors to form a partnership to invest in commercial real estate (id. at *1). In concluding that defendant fraudulently induced plaintiffs to enter into the partnership, the court determined that defendant had misled plaintiffs about his competence to manage their properties and protect their investment, and he also concealed the fact that he would be receiving a consultation fee that was baked into the purchase price of the properties (id. at *6-7). Critically, in reaching this [*9]conclusion, the court credited the fact that plaintiffs had trusted defendant based upon their past relationship, and that the parties' partnership "was not an arm's length transaction between sophisticated business men" (id. at *7). As a result, unlike this case, the Huang court had ample support in the record to conclude that defendant "possessed superior knowledge" so as to determine that defendant's failure to disclose material facts would "render[] the transaction inherently unfair" (id.; cf. also Williams v Sidley Austin Brown & Wood L.L.P., 38 AD3d 219, 220 [1st Dept 2007] [concluding that complaint supported plausible inference of fraud where plaintiff's lender and financial service provider had "special knowledge or information" regarding how the IRS would treat certain tax deductions that the IRS subsequently disallowed]).
Finally, to the extent KSFB claims that it was induced to enter into the Engagement Letter because defendants purportedly withheld their use of confidential information under the NDA, this aspect of KSFB's claim is duplicative of its breach of contract claim (see 110 E. 138 Realty LLC v Rydan Realty, Inc., 210 AD3d 513, 514 [1st Dept 2022] [dismissing fraud claim as duplicative of breach of contract claim when claim was based on the same facts that underlie the contract cause of action]).
In sum, KSFB has failed to allege a cause of action premised on its Fraud-Based Claims. Counts VI, VII, and IX of the Complaint are dismissed.
IV. Breach of Fiduciary Duty (Counts II & III)
The next claims targeted by defendants' motion are KSFB's breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims (MOL at 11-17; Reply at 9-13). On this point, defendants contend, among other things, that KSFB waived any fiduciary duty claim through the Engagement Letter and, in any event, the Complaint fails to establish that KSFB and Goldman Sachs had any extra-contractual relationship of higher trust giving rise to a fiduciary duty (MOL at 12-14). In response, KSFB avers that the Engagement Letter's waivers are voidable and, regardless, the question of whether there is a fiduciary relationship is a fact-specific inquiry that cannot be resolved on a motion to dismiss (Opp at 25).
It is well settled that "[t]o state a claim for breach of fiduciary duty, plaintiffs must allege that (1) defendant owed them a fiduciary duty, (2) defendant committed misconduct, and (3) they suffered damages caused by that misconduct" (Besen v Farhadian, 195 AD3d 548, 549 [1st Dept 2021]). A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (EBC I, 5 NY3d at 19). "Generally, where parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency'" (id.).
Of course, "fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation" (First Keystone Consultants, Inc. v DDR Constr. Servs., 74 AD3d 1135, 1136 [2d Dept 2010]). That said, "[a] conventional business relationship, without more, is insufficient to create a fiduciary relationship. Rather, a plaintiff must show special circumstances that transformed the parties' business relationship to a fiduciary one" (Legend Autorama, Ltd. v Audi of Am., Inc., 100 AD3d 714, 717 [2d Dept 2012]). This, in turn, requires a plaintiff to plead facts from which it can be inferred that there were special circumstances in which a party "reposed confidence in [the other party] and reasonably relied on the other's superior expertise or knowledge" (see Wiener v [*10]Lazard Freres & Co., 241 AD2d 114, 122 [1st Dept 1998]).
At the outset, it appears that KSFB's fiduciary duty claim is precluded by the express terms of the Engagement Letter. As the Engagement Letter states, "[n]othing in this letter or the nature of [Goldman Sachs's] services in connection with this engagement or otherwise shall be deemed to create a fiduciary duty or fiduciary or agency relationship between" Goldman Sachs and Focus and KSFB (EL at 4). The plain terms of the Engagement Letter therefore undercut any basis to conclude that there was an inherent interdependency between the Goldman Sachs and KSFB so as to create a fiduciary relationship between the two (Plaintiffs' State and Sec. Law Settlement Class Counsel v Bank of NY Mellon, 43 Misc 3d 887, 898 [Sup Ct, NY County, 2014] [dismissing claim for fiduciary duty where asserted fiduciary duties were inconsistent with those duties assumed and/or disclaimed pursuant to the parties' agreement]).
In any case, even assuming the Engagement Letter's fiduciary-duty waiver did not control, KSFB still fails to plausibly allege a fiduciary relationship existed with Goldman Sachs. As the lone basis for its fiduciary duty claim, KSFB maintains that Goldman Sachs owed it a fiduciary duty because it was "an advisor charged with seeking a deal in the best interests of KSFB," and KSFB accordingly put great trust in Goldman Sachs to retain its services as its investment banker for the joint sale of the NKSFB Business (compl ¶¶ 112-113). This bald and unsupported assertion, however, falls well short of pleading the requisite "special circumstances" to establish a relationship of higher trust or obligations that, in turn, resulted in KSFB relying on Goldman Sachs's superior knowledge and expertise in the Joint NKSFB Sale (see Video Elephant Ltd. v Blake Broadcasting LLC, 2024 WL 68525, at *4 [SD NY, Jan. 5, 2024, No. 21-CV-0503-LTS] ["Although [plaintiff] need not plead the technicalities of the existence of a fiduciary relationship in order to state a claim, its allegations of an agency relationship in particular are conclusory and unsupported"]; cf. generally compl ¶¶ 16, 54, 109, 120, 138, 145, 160 [detailing how KSFB expended over 300 hours and significant resources for the process of identifying buyers, negotiating nondisclosure agreements, attending meetings and telephone conferences, and research and analyzing potential bids as part of the Joint NKSFB Sale process]).
At bottom, in the absence of a sufficiently pleaded fiduciary duty owed by Goldman Sachs to KSFB, KSFB's breach of fiduciary duty claim is dismissed. Such a conclusion also mandates dismissal of KSFB's aiding and abetting claim against Focus, Chang, and Fels (see McBride v KPMG Intl., 135 AD3d 576, 579 [1st Dept 2016] [affirming dismissal of aiding and abetting claim where "there was no underlying breach of fiduciary duty"]).
V. Tortious Interference with Prospective Economic Advantage (Count V)
The second-to-last cause of action challenged by defendants is KSFB's tortious interference with prospective economic advantage claim against Focus and Goldman Sachs (MOL at 28-31; Reply at 16-18). To state a claim for tortious interference with prospective economic advantage, "a plaintiff must demonstrate that the defendant's interference with its prospective business relations was accomplished by 'wrongful means' or that defendant acted for the sole purpose of harming the plaintiff" (Snyder v Sony Music Entertainment, 252 AD2d 294, 299-300 [1st Dept 1999]). "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure" (Guard-Life Corp. v Parker Hardware Mfg. Corp., 50 NY2d 183, 191 [1980]). And such [*11]conduct by wrongful means must be directed "not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship" (Carvel Corp. v Noonan, 3 NY3d 182, 192 [2004]).
Here, KSFB avers that Goldman Sachs and Focus "interfered with KSFB's relations with prospective buyers" by securing a buyer for Focus rather than for the Joint NKSFB Sale (compl ¶ 149). But the Complaint is devoid of any allegations that Focus or Goldman Sachs directed any alleged wrongful conduct toward KSFB's prospective buyers, rather than toward KSFB itself (cf. id. ¶¶ 47-55). In the absence of any allegations of this type of wrongful conduct by Focus or Goldman Sachs, defendants' motion to dismiss this claim is granted (see Bradbury v Israel, 204 AD3d 563, 565 [1st Dept 2022] [affirming dismissal of tortious interference with prospective business relations claim where complaint contained no allegations of "any conduct constituting 'wrongful means'" that was "directed at the third parties with whom plaintiff sought to have the relationship").
VI. Unjust Enrichment (Count XIII)
The last claim challenged by defendants is KSFB's unjust enrichment claim (MOL at 31-32; Reply at 18-19). To state a claim for unjust enrichment, a plaintiff must allege that "the other party was enriched, at plaintiff's expense, and that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered'" (Georgia Malone & Co., Inc. v Ralph Rieder, 86 AD3d 406, 408 [1st Dept 2011]). Here, in seeking dismissal, defendants maintain that KSFB fails to allege that defendants were enriched at KSFB's expense (MOL at 31). The court agrees.
At its core, KSFB's claim is premised on the fact that defendants "profited handsomely" through a purported "scheme" to convince KSFB that Goldman Sachs and Focus were committed to securing buyer for the proposed joint sale of the NKSFB Business while Goldman Sachs and Focus pursued a separate, conflicting transaction (compl ¶¶ 172-174). But the fact that defendants derived a profit from the CD&R transaction is not, alone, a basis to conclude or infer that they were unjustly enriched.
To begin, even if they had led KSFB to believe they were only pursuing the Joint NSKFB Sale, defendants' alleged "enrichment" was directly derived from a separate and independent transaction with CD&R (see Cresco Labs NY, LLC v Fiorello Pharms., Inc., 200 AD3d 601, 601-602 [1st Dept 2021] [concluding that proposed unjust enrichment claim was palpably insufficient where defendants' purported enrichment was through the receipt of "a large sum of money from [a] nonparty," rather than from plaintiffs]; see also Swain v Brown, 135 AD3d 629, 632 [1st Dept 2016] ["Unjust enrichment occurs when a defendant enjoys a benefit bestowed by the plaintiff without adequately compensating the plaintiff"]). And, regardless, there is simply no basis to conclude or infer from the pleadings that KSFB would have somehow been entitled to any portion of the funds received from the CD&R transaction so as to conclude that any profit obtained by defendants came directly at KSFB's expense (see Heller v Kurz, 228 AD2d 263, 264-265 [1st Dept 1996] [affirming dismissal quantum meruit claim where "individual defendants ha[d] been enriched by the sale of shares they owned in the corporation" but complaint failed to establish that plaintiff "performed any additional services for the individual defendants for which he reasonably expected compensation from them"]).
In the absence of allegations that defendants were enriched at KSFB's expense, [*12]defendants' motion to dismiss KSFB's unjust enrichment claim is granted.

 Conclusion
For the foregoing reasons, it is hereby
ORDERED that defendants' motion to dismiss (MS005) is granted in its entirety and the complaint is dismissed; and it is further
ORDERED that the Clerk of the Court shall enter judgment accordingly; and it is further
ORDERED that counsel for defendants are directed to serve a copy of this order, together with notice of entry, upon plaintiff and the Clerk of the Court within 10 days of this order.
This constitutes the Decision and Order of the court.
DATE 01/22/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1:This matter was previously assigned to Justice Joel M. Cohen. However, by Order, dated May 10, 2024, Justice Cohen recused himself and this matter was reassigned to the undersigned (see NYSCEF # 60).

Footnote 2:Although ultimately relying on federal case law interpreting Federal Rule of Civil Procedure 12(b)(6), courts in this state have repeatedly recognized that "[i]n assessing the legal sufficiency of a claim, [a] [c]ourt may consider those facts alleged in the complaint, documents attached as an exhibit therefor or incorporated by reference . . . and documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference" (see Dragonetti Bros. Landscaping Nursery & Florist, Inc. v Verizon NY, Inc., 71 Misc 3d 1214[A], at *2 [Sup Ct, NY County, 2021], affd 208 AD3d 1125 [1st Dept 2022]; Lore v NY Racing Assn. Inc., 12 Misc 3d 1159[A], at *2 [Sup Ct, Nassau County, 2006], citing Pisani v Westchester County Health Care Corp., 424 F Supp 2d 710, 714 [SD NY 2006]). Here, by explicitly referencing and describing the Management Agreement in the Complaint, KSFB has incorporated the document into its pleadings.

Footnote 3:Defendants submit a copy of this press release as part of their motion papers (see NYSCEF # 45). As that press release indicates, the "exclusivity agreement" was between non-party Focus Financial Partners, Inc. (FFPI), rather than defendant Focus Financial Partners, LLC (id.).

Footnote 4:To the extent that KSFB's Paragraph 8 claim is premised on a purported failure to respond to KSFB's request that Goldman Sachs turn over all information shared by Focus (see compl ¶ 108), that claim fails to articulate how, if at all, Goldman Sachs and/or Focus have failed to comply with this provision or how, if it all, KSFB was damaged by such a breach.